UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| HOLLIE T. NOVELETSKY, et al.,   ) | |
| ) | |
| *Plaintiffs*   ) | |
| ) | |
| v.   ) | No. 2:12-cv-21-NT |
| ) | |
| METROPOLITAN LIFE INSURANCE   ) | |
| COMPANY, INC., et al.,   ) | |
| ) | |
| *Defendants*   ) | |

MEMORANDUM DECISION AND ORDER
ON DISCOVERY DISPUTES

The parties have filed briefs addressing the defendants' refusal to produce two categories of documents, *see* Plaintiffs' Discovery Brief ("Plaintiffs' Brief") (ECF Nos. 63); Defendant[s] Metropolitan Life Insurance Company, Alan Silverman and Francine Temkin's Motion . . . To Respond to Plaintiffs' Request for Certain Documents ("Defendants' Brief") (ECF No. 66); Defendants Metropolitan Life Insurance Company, Alan Silverman and Francine Temkin's Response to Plaintiffs' Discovery Brief ("Defendants' Response") (ECF No. 71); Plaintiffs' Response to Defendants' Discovery Brief ("Plaintiffs' Response") (ECF No. 72). For the reasons that follow, I conclude that (i) the defendants fall short of meeting their burden of showing that the work product doctrine shields the first category of documents, statements made by defendants Alan Silverman and Francine Temkin to the compliance department of defendant Metropolitan Life Insurance Company, Inc. ("MetLife"), and (ii) the plaintiffs fail to meet their burden of showing that they cannot obtain, without undue hardship, the substantial equivalent of the second category of documents, so-called universal life insurance policy "illustrations" created during the course of the instant litigation, which I conclude are protected work product.

Accordingly, treating the instant discovery dispute as a motion to compel the production of those two categories of documents, I grant the motion in part with respect to the first category, ordering that the defendants produce the Temkin and Silverman statements within 14 days of the date of this order, and otherwise deny it.

## I. Statements to Compliance Department

The plaintiffs seek the disclosure of statements made to the MetLife compliance department in November 2011 by Temkin and Silverman with respect to issues raised in a complaint sent to MetLife in September 2011 by insurance broker George Blaisdell on behalf of plaintiff Hollie Noveletsky. *See* Plaintiffs' Brief at 2-8; Plaintiffs' Response at 1-4. The defendants argue that the statements are shielded from discovery by the work product doctrine. *See* Defendants' Brief at 2-5. However, as the plaintiffs point out, *see* Plaintiffs' Response at 1-4, the defendants fall short of meeting their burden of demonstrating a key element of work product protection: that the statements were prepared for purposes of litigation. I, therefore, order those statements to be produced to the plaintiffs.

### A. Applicable Legal Standards

Work product protection extends "to documents and other tangible things that are prepared in anticipation of litigation or for trial." *United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 27 (1st Cir. 2009) (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).").[1]

---

[1] "[F]ederal courts apply federal law when addressing the work product doctrine, even in diversity cases lacking any federal question." *S.D. Warren Co. v. Eastern Elec. Corp.*, 201 F.R.D. 280, 282 (D. Me. 2001).

"It is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated." *Textron*, 577 F.3d at 29 (emphasis in original). "It is only work done in anticipation of or for trial that is protected." *Id*. at 30. "Even if prepared by lawyers and reflecting legal thinking, "materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by [work product protection]." *Id*. (citation and internal punctuation omitted). *See also, e.g., American Home Assurance Co. v. United States*, Civil Action No. 09-cv-258 (DMC), 2009 WL 3245445, at *1 (D.N.J. Oct. 7, 2009) ("Documents created in the ordinary course of business that prove useful in future litigation are not protected by the work-product doctrine.").

"The party asserting the attorney-client or work product privilege bears the burden of showing that the privilege applies." *Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1, 17 (1st Cir. 2012). "If the privilege is established, the burden of proving any exception falls to its proponent." *Id*. Documents protected by the work product doctrine are nonetheless discoverable if, *inter alia*, "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

### B.  Factual Background

The policy at issue in this suit, a $5 million MetLife whole life policy on the life of Noveletsky, was sold by MetLife agent Silverman in 2001 and delivered to Temkin, another MetLife agent, as trustee of the Joshua W. Rosenthal Irrevocable Trust ("Trust"). Affidavit of Alan L. Silverman ("Silverman Aff.") (ECF No. 66-1), attached to Defendants' Brief, ¶¶ 1-2; First Amended Complaint (ECF No. 40) ¶ 27; Defendant Francine Temkin's Answer and

Affirmative Defenses to First Amended Complaint (ECF No. 61) ¶ 27.  The policy was intended to provide a means for Noveletsky's son, Joshua Rosenthal, to pay expected estate taxes upon his mother's death.  Deposition of Hollie T. Noveletsky ("Noveletsky Dep.") (ECF No. 71-1), Exh. A to Defendants' Response, at 134-36.

Several years after the policy was sold, Noveletsky had a falling out with Temkin, the sister of Noveletsky's ex-husband, after Temkin invited her brother's girlfriend to a family event.  Deposition of Francine Temkin ("Temkin Dep.") (ECF No. 71-2), Exh. B to Defendants' Response, at 49-51; Noveletsky Dep. at 152, 177-78.  Noveletsky no longer trusted Temkin and stopped attending family holiday gatherings.  Noveletsky Dep. at 152, 178.

On August 9, 2011, Silverman and Temkin were summoned to a meeting at Noveletsky's place of business to discuss the MetLife policy.  Silverman Aff. ¶ 3.  At the meeting, they were subjected to hostile interrogation, lasting nearly two hours, by George Blaisdell, a group insurance broker purportedly speaking for Noveletsky.  *Id*. ¶ 4.  The tenor of the meeting was so adversarial that it occurred to Silverman at the time that it was a prelude to a lawsuit against MetLife, Temkin, and himself.  *Id*. ¶ 5.  Temkin also found the meeting very contentious and "awful."  Affidavit of Francine Temkin ("Temkin Aff.") (ECF No. 66-3), attached to Defendants' Brief, ¶ 1; Temkin Dep. (ECF No. 66-4), Exh. A to Defendants' Brief, at 138.  At the conclusion of the meeting, she anticipated that litigation might ensue.  Temkin Aff. ¶ 1.  After that meeting, Silverman advised Temkin to resign as trustee because he saw a lawsuit coming.  Silverman Aff. ¶ 6.

On September 26, 2011, on behalf of Noveletsky, Blaisdell transmitted a two-page written complaint to MetLife regarding the life insurance policy at issue in this case, which he stated "did not conform to appropriate standards of suitability."  Complaint Letter from George

4

W. Blaisdell to Metropolitan Life Insurance Company ("Blaisdell Complaint") (ECF No. 63-1), Exh. A to Plaintiffs' Brief, at 1; Silverman Aff. ¶ 7.  Blaisdell added that "an egregious conflict of interest" surrounded the transaction because a MetLife agent was "the owner and trustee of this contract."  Blaisdell Complaint at 1.  After reading the complaint, Silverman's intuition that a lawsuit was imminent became a virtual certainty in his mind.  Silverman Aff. ¶ 7.

On October 27, 2011, Chad Stefan of MetLife took a call from Thomas Heaney, who had recently been appointed trustee of the Trust, in which Heaney stated that he would like MetLife to respond to the concerns raised by Blaisdell in his September 2011 correspondence and would like the matter to be escalated.  Memo of Telephone Call ("Stefan Memo") (ECF No. 66-6), Exh. C to Defendants' Brief.  Heaney inquired how long an investigation would take.  *Id.*  Stefan told him that he could not give him a specific time frame but that MetLife would investigate the matter.  *Id.*[2]

Temkin understands that, sometime prior to early November 2011, Silverman notified the MetLife compliance department about the circumstances discussed at the August 2011 meeting.  Temkin Aff. ¶ 2.

Pursuant to MetLife's Customer Complaints policy, all written complaints, as well as memoranda documenting oral complaints, must be immediately forwarded to a representative's manager, who must, in turn, immediately notify the Johnstown Compliance Resource Center ("CCR") of Corporate Ethics and Compliance ("CEC") of the complaint.  Customer Complaints (NASD Rules 3070 & 3110) ("Complaints Policy") (ECF No. 63-3), Exh. C to Plaintiffs' Brief, at 2.  Representatives must never attempt to resolve complaints on their own.  *Id.*  Upon the receipt of a complaint, the CCR requests that the manager obtain a detailed statement from the

---

[2] The Stefan Memo misspells Heaney's name as "Haeney."  Stefan Memo.  I have corrected the error.

representative. *Id*. For several distribution channels, this communication is done through "COMS.com," not a defined term in the policy. *Id*. All representatives are required to submit their statements to the CCR within five business days of notification. *Id*. at 3. A representative who does not cooperate with the CCR's request for a statement may be the subject of disciplinary action, up to and including termination. *Id*.

The policy defines a "complaint" as "a communication, in whatever form, primarily expressing a grievance or dissatisfaction with the Enterprise, its products, or its associates in which the customer is expecting a response from the Enterprise." *Id*. at 2. Complaints can range from service issues such as a failure to process a customer's request or return a customer's telephone call, *see id*. at 2, to a "reportable event" as defined by the NASD (National Association of Securities Dealers), including "[a] sales practice violation containing a claim for compensatory damages . . . of $5,000 or more" or "[f]orgery, theft, misappropriation or conversion of funds or securities[,]" *id.* at 4.

By email to Temkin dated November 7, 2011, Cheryl Tompkins, MetLife Senior Agency Compliance Consultant, stated that she had received "a COMS complaint" regarding the policy owned by the Trust. Email dated November 7, 2011, from Cheryl Tompkins to Francine Temkin (ECF No. 63-2), Exh. B to Plaintiffs' Brief. She requested that Temkin answer 12 questions, stating that it was "important that [Temkin] respond promptly, accurately, and effectively to address Mr. Heaney[']s concern(s)." *Id*. In early November, Silverman also was asked by the MetLife compliance department to make a written statement in response to a number of enumerated questions prompted by Blaisdell's complaint letter. Silverman Aff. ¶ 9.

When Temkin prepared her responses to those questions in early November 2011, she did so anticipating that the case could go to litigation and believed that her responses would be used

to prepare for such possible litigation. Temkin Aff. ¶ 3. On or about November 9, 2011, Silverman submitted the written statement as requested. Silverman Aff. ¶ 10. At that time, he was confident that a lawsuit was going to be filed by Noveletsky and others against MetLife, Temkin, and himself. *Id*. ¶ 11.

Noveletsky retained counsel with the purpose of asserting a claim against MetLife and its agents in October or November 2011. Noveletsky Dep. at 133. The instant suit was filed on January 20, 2012. ECF No. 1.

### C. Discussion

In both their main and responsive briefs, the defendants contend that Temkin's and Silverman's statements are shielded by work product protection because (i) at the time that the statements were written, Temkin and Silverman subjectively believed that litigation was likely, and (ii) that belief was objectively reasonable in light of the personal falling-out between Temkin and Noveletsky, the extremely hostile tone of the August 2011 meeting, Blaisdell's strongly worded September 2011 complaint, Heaney's October 2011 request that the matter be escalated, and Noveletsky's retention in October or November 2011 of counsel, leading to the January 2012 filing of the instant complaint. *See* Defendants' Brief at 4-5; Defendants' Response at 1-4.

This argument is well-taken. However, as the plaintiffs point out, *see* Plaintiffs' Response at 1-4, it is insufficient. The defendants ignore the plaintiffs' contention that Temkin and Silverman prepared the statements at issue pursuant to a corporate complaint policy designed, in part, to meet regulatory requirements and applicable to complaints running the gamut from trivial to serious accusations. *See* Plaintiffs' Brief at 3, 7-8; Defendants' Response at 1-5. From all that appears, Temkin and Silverman were required to, and would have, created the statements at issue regardless of whether litigation was anticipated. That is fatal to the

defendants' bid for work product protection. *See, e.g., Textron*, 577 F.3d at 30 ("work product protection does not extend to documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation") (citation and internal quotation marks omitted); *Zagklara v. Sprague Energy Corp.*, No. 2:10-cv-445-JAW, 2011 U.S. Dist. LEXIS 67540, at *4 (D. Me. June 22, 2011) (defendant had not met burden of showing that email sent to its operations officers at the request of its general counsel days after the accident at issue in the lawsuit was subject to work product protection when there had been "no showing by the defendant that the author of the document anticipated litigation at the time that the document was created, *or* would not have created the document in essentially the same way had the prospect of litigation not existed") (emphasis added); *In re Grand Jury Subpoena*, 220 F.R.D. 130, 157 (D. Mass. 2004) ("Regulated industries are in frequent contact with regulators, and a great deal of the work that regulatory attorneys do is in anticipation of such discussions, perhaps even for the 'primary purpose' of preparing for such discussions. It is clear from the cases that refuse to extend work product protection to documents prepared in the ordinary course of business that compliance work falls within this latter category.").

    The defendants having failed to meet their burden of demonstrating that the statements at issue are entitled to work product protection, the plaintiffs are entitled to discover them.[3]

## II. Policy Illustrations

    The plaintiffs also seek to compel the production of insurance policy illustrations about which Silverman testified during his June 5, 2012, deposition. *See* Plaintiffs' Brief at 8-10; Plaintiffs' Response at 4-6. The defendants object on the bases that (i) the documents are

---

[3] I do not reach the plaintiffs' alternative argument that, even if the statements are subject to the work product doctrine, they demonstrate a substantial need for them and cannot obtain their substantial equivalent by other means. *See* Plaintiffs' Brief at 8.

shielded by both the attorney client privilege and work product protection, (ii) with respect to work product protection, the plaintiffs fail to demonstrate that they have a substantial need for the materials and cannot, without undue hardship, obtain their substantial equivalent by other means, and, (iii) in any event, the documents are irrelevant because the illustrations were predicated on the wrong policy pricing.  *See* Defendants' Brief at 5-8; Defendants' Response at 5-6.  Although I conclude that the illustrations are relevant and are not subject to the attorney client privilege, I find that they are subject to work product protection and that the plaintiffs have failed to demonstrate that they cannot, without undue hardship, obtain their substantial equivalent by other means.  Accordingly, I deny the plaintiffs' motion to compel the production of the illustrations.

### A.  Applicable Legal Standards

Standards governing the applicability of the work product doctrine are set forth above.  The parties agree that, in this diversity action, Maine law governs with respect to the applicability of attorney client privilege.  *See* Plaintiffs' Brief at 6; Defendants' Response at 7.  Pursuant to Maine law:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, or (2) between the lawyer and the lawyer's representative, or (3) by the client or the client's representative or the lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein, or (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

Me. R. Evid. 502(b).  There are six enumerated exceptions to the application of the privilege, none of which applies in this case.  *See id*. 502(d) (no privilege under Rule 502 with respect to (i) furtherance of crime or fraud, (ii) claimants through same deceased client, (iii) breach of duty

9

by a lawyer or client, (iv) document attested by a lawyer, (v) joint clients, and (vi) public officer or agency).

### B. Factual Background

At his June 5, 2012, deposition, Silverman was asked by the plaintiffs' attorney, Sigmund Schutz, how much a $5 million universal life insurance policy would have cost in 2001. Deposition of Alan L. Silverman ("Silverman Dep.") (ECF No. 63-4), Exh. D to Plaintiffs' Brief, at 27. He answered: "I'm going to estimate around [$]35,000 a year for lifetime[,]" *versus* the $66,750 annual premium of the policy actually sold. *Id*. Asked whether the $35,000 figure was based on memory, he responded: "I would have wanted to find out what that cost was so I secured information. I inquired about it." *Id*. at 27-28. He testified that he had made that inquiry within the prior six to eight months. *Id*. at 28. After being asked who gave him that information, Silverman conferred with his attorney, John Whitman. *See id*. at 29. Whitman then stated:

> Sig, any substantive answer to these questions I'm going to object to. I mean, you can ask them one at a time and I'll do the objection if you'd like. But just so you know, I'll object on the grounds of attorney-client privilege and work product or 26(b)(3) protection with respect to any associated documents.

*Id*. at 30. Schutz clarified that he wished to ask follow-up questions to find out what the $35,000 figure was based on and how it was documented. *See id*. at 31. Whitman responded:

> I'll tell you. It's something that was done through attorneys both at MetLife and outside. They were involved in every step of the process. It was any documentation that's been produced. And I don't think I've seen any documentation. But it's absolutely prepared in anticipation of litigation.

*Id*.

Schutz protested: "I think I'm entitled to know and I'm not required to accept representations, bald representations as to what costs are without inquiring as to the basis for

those, where they were derived, from whence they came and so forth." *Id.* at 34. In response to a further question, Silverman testified:

> UL policies back in 2001 were of a different nature than they are now. And ballpark, the premium's roughly 50 percent of what the whole life premium would be, all things being equal, standard rating, male, female and age. So I was quite curious to see how close it was to 50 percent, which is where the [$]35,000 came from.

*Id.* at 35. In response to later questions, Silverman testified that he, personally, did not have the capability to create illustrations containing pricing from 2001 but that persons within the MetLife competitive unit could do so, among them Kevin Finneran. *See id.* at 43-46.

Daniel Mawhinney, attorney for MetLife, submits an affidavit in which he states that:

1.   He received an email identified as "Attorney Client Work Product" on May 1, 2012, from in-house MetLife legal counsel Blossom Kan. Affidavit of Daniel R. Mawhinney ("Mawhinney Aff.") (ECF No. 66-8), attached to Defendants' Brief, ¶¶ 3-4. The email contained a chain of correspondence between Kan and Finneran, who is the Assistant Vice President-Life Product Management for MetLife. *Id.* ¶ 5. The email correspondence concerned illustrations regarding universal life policies purportedly available in 2001, at the time that the whole life policy was sold to the Trust. *Id.* ¶ 6.

2.   In later conversation with Finneran, Mawhinney learned that the pricing used for the illustrations was not available in 2001 but was, instead, pricing used before 2001. *Id.* ¶ 7.

3.   The illustrations completed by Finneran were marked "Attorney Client privilege." *Id.* ¶ 8. It is Mawhinney's understanding that Silverman requested the illustrations. *Id.* ¶ 9. Mawhinney was also discussing universal life illustrations at the time with Kan. *Id.* ¶ 10.

4.   Because MetLife and Silverman have entered into a joint defense agreement, Mawhinney provided the illustrations to counsel for Silverman. *Id.* ¶ 12.

5. Mawhinney has discussed these illustrations with the plaintiffs' counsel, Schutz, on several occasions. *Id*. ¶ 13. He has agreed to provide a copy of the illustrations to Schutz, provided that Schutz acknowledge that, by doing so, Mawhinney, MetLife, Silverman, and Temkin have not waived any attorney client privilege or work product doctrine with regard to related documents or communications, and that their production not be used as grounds to re-depose Silverman. *Id*. Schutz has not agreed to that acknowledgement. *Id*. Further, Mawhinney has represented to Schutz that these illustrations are not relevant to the matter at hand because pricing used for them did not exist as of 2001, when the policy was issued insuring Noveletsky. *Id*.

6. MetLife has provided voluntarily, and without requests from the plaintiffs' counsel, illustrations for the MetLife universal life policy available in 2001 with the actual pricing available in 2001. *Id*. ¶ 14. In fact, Mawhinney has provided the plaintiffs' counsel with multiple illustrations attempting to provide comparisons of policy pricing and costs. *Id*. ¶ 15.

### C. Discussion

The defendants seek to shield the illustrations from discovery on the basis, *inter alia*, that they are irrelevant. *See* Defendants' Response at 5-6. They represent that the illustrations at issue "concern pricing which predated [2001] and were out of date at the time of the sale of the policy to the trust" and that the illustrations, therefore, cannot be used by the plaintiffs to accurately compare the price of a universal life policy with the price of a whole life policy in 2001. *See id*. at 5. They note that they have already voluntarily provided the plaintiffs with illustrations that they contend accurately reflect the cost of a universal life policy in 2001. *See id*. at 6.

The plaintiffs protest that they are not obliged simply to accept at face value MetLife's representations concerning the accuracy, or inaccuracy, of its clashing cost quantifications, *see* Plaintiffs' Response at 6, and I agree. Silverman testified without qualification that the cost of a universal life policy in 2001 was about $35,000 annually in premiums, about half of the cost of the whole life insurance policy sold to the Trust, which cost $66,750 annually in premiums. *See* Silverman Dep. at 27, 35. The defendants concede that the cost of universal *versus* whole life policies in 2001 is a major issue in this case. *See* Defendants' Brief at 7. The policy illustrations on which Silverman predicated his testimony are relevant for purposes of discovery, regardless of whether they ultimately are found to contain erroneous data and/or would be ruled inadmissible at trial.

The defendants also initially sought to shield the illustrations on the basis of invocation of the attorney client privilege. *See* Defendants' Brief at 7-8. However, in response to the plaintiffs' clarification that they seek only the illustrations themselves, which they characterize as non-privileged underlying facts rather than privileged communications, *see* Plaintiffs' Brief at 6, 9-10, the defendants press only their relevance and work product objections, seemingly conceding the point that the attorney client privilege does not attach in those circumstances, *see* Defendants' Response at 5-6.

In any event, even if the defendants do not impliedly waive their objection, I conclude, on the showing made, that the transmission to an attorney of illustrations created by Finneran at Silverman's request did not suffice to confer attorney-client privileged status on them. *See, e.g., Massachusetts v. First Nat'l Supermarkets, Inc.*, 112 F.R.D. 149, 152 (D. Mass 1986) ("[A] party cannot ask an adverse party what he said or wrote to his attorney but, on the other hand, an adverse party cannot decline to disclose relevant facts merely because the facts were related to an

attorney."); 24 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5484, at 321 (1986) ("Information in the possession of corporate employees does not become privileged simply because it was embodied in a communication to corporate counsel. Any employee who has the relevant information may be required to divulge it during trial or deposition, and the corporation may be required to reveal the knowledge in response to an interrogatory so long as what is asked for is the information and not the revelation of a communication to counsel.") (footnotes omitted)

The defendants do succeed, however, in demonstrating that the illustrations qualify for work product protection. At approximately the same time as the plaintiffs filed suit, Silverman made the request that led to the creation of the illustrations, which bear on an issue of central importance in this case. Although the plaintiffs argue that the illustrations were "created in connection with MetLife's business practices" rather than "in anticipation of litigation," Plaintiffs' Brief at 10; Plaintiffs' Response at 4, and that presumably is true of *most* MetLife illustrations, *these* illustrations were created at the behest of Silverman in connection with the defense of the instant suit. In short, they would not exist but for the instant litigation.[4]

The plaintiffs contend that, even if the illustrations do constitute protected work product, they should nonetheless be entitled to discover them because (i) they were prevented from obtaining equivalent information at Silverman's deposition by the defendants' instructions to Silverman not to answer, (ii) to the extent that Silverman cannot recall pricing information from

---

[4] To the extent that the plaintiffs argue that, for purposes of work product protection, the defendants must establish that the communications were made to or by attorneys or were prepared by attorneys, *see* Plaintiffs' Brief at 1, they are mistaken, *see, e.g., Geller v. North Shore Long Island Jewish Health Sys.*, No. CV 10-170(ADS)(ETB), 2011 WL 5507572, at *3 (E.D.N.Y. Nov. 9, 2011) ("[I]n contrast to the attorney-client privilege, the attorney work product doctrine does not require that the documents be prepared at the behest of counsel, only that they be prepared because of the prospect of litigation.") (citation and internal quotation marks omitted); *Precision Airmotive Corp. v. Ryan Ins. Servs., Inc*., No. 2:10-mc-244-JHR, 2011 WL 148818, at *7 (D. Me. Jan. 17, 2011) ("Materials need not be prepared by or for an attorney to qualify for [work product] protection[.]").

2001, they cannot obtain equivalent information from him, and (iii) the defendants, who have produced other illustrations created during the course of this litigation, cannot pick and choose which illustrations to disclose and which to shield as work product. *See* Plaintiffs' Response at 4-5.

The third point seemingly is in the nature of a waiver or equitable balancing argument; however, the plaintiffs cite no authority to support it, and its basis is not otherwise clear. The argument, hence, is sufficiently undeveloped as to be forfeited. *See, e.g., Crowe v. Bolduc,* 215 F. Supp.2d 233, 238 (D. Me. 2002), *aff'd,* 334 F.3d 124 (1st Cir. 2003); *Graham v. United States,* 753 F. Supp. 994, 1000 (D. Me. 1990).

The first two points implicate the question of whether the plaintiff is unable, without undue hardship, to obtain the substantial equivalent of the illustrations. Yet, Mawhinney avers that he agreed to provide a copy of these very illustrations to Schutz provided that Schutz acknowledge that by doing so, Mawhinney and the defendants had not waived any attorney client privilege or work product doctrine with regard to related documents or communications, and that their production not be used as a basis to re-depose Silverman. *See* Mawhinney Aff. ¶ 13. The plaintiffs do not even discuss this offer, much less attempt to explain why the proposed conditions might have constituted an undue hardship. *See* Plaintiffs' Response at 4-6. They, therefore, fall short of making the showing necessary to override work product protection.

### III. Conclusion

For the foregoing reasons, and treating the instant discovery dispute as a motion by the plaintiffs to compel the production of documents, the motion is **GRANTED** in part with respect to statements provided by Temkin and Silverman to the MetLife compliance department, which

the defendants are hereby **ORDERED** to produce within 14 days of the date of this order, and otherwise **DENIED**.

### *NOTICE*

*In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.*

*Failure to file a timely objection shall constitute a waiver of the right to review by the district court and to any further appeal of this order.*

Dated this 27th day of September, 2012.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge