### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **HOLLIE T. NOVELETSKY, et al.,** | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | **No. 2:12-cv-21-NT** |
| | ) | |
| **METROPOLITAN LIFE INSURANCE** | ) | |
| **COMPANY, INC., et al.,** | ) | |
| | ) | |
| *Defendants* | ) | |

### RECOMMENDED DECISION ON DEFENDANT ALAN SILVERMAN'S MOTION FOR SUMMARY JUDGMENT

Defendant Alan L. Silverman moves for summary judgment as to all claims against him on the basis that two of the plaintiffs, Hollie T. Noveletsky and Joshua W. Rosenthal, lack standing to sue him and the claims of the third plaintiff, Thomas Heaney, are time-barred. *See* Defendant Alan Silverman's Motion for Summary Judgment ("Motion") (ECF No. 95) at 3-13. Alternatively, he seeks summary judgment on the basis that he owes no legal duties to any of the plaintiffs and is entitled to judgment as a matter of law as to each claim asserted against him. *See id*. at 13-28.  For the reasons that follow, I conclude that Silverman is correct that neither Noveletsky nor Rosenthal has standing to sue him and that the claims of Heaney are time-barred. Accordingly, I recommend that the court grant the Motion.  I need not, and do not, consider Silverman's alternative basis for summary judgment in his favor.

### I.  Applicable Legal Standards

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "A dispute is genuine if the evidence

about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a

responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id.*  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id.*  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id.*

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id.*; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1st Cir. 2008); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II.  Factual Background

Silverman objects to most of the plaintiffs' additional statements of material facts on the ground that they are irrelevant.  *See generally* Alan Silverman's Reply Statement of Material

Facts ("Defendant's Reply SMF") (ECF No. 111).  I agree that none of these statements is outcome-determinative.  Nonetheless, I have included many in my recitation of the facts to place my analysis in context.  With that caveat, the parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of the plaintiffs as nonmovants, reveal the following.[1]

## A.  Initial Meetings with Silverman

Novel Iron Works ("Novel"), founded in 1956 by Ralph Noveletsky, is a structural steel fabrication company that has been owned and operated by the Noveletsky family for more than 50 years.  Statement of Undisputed Material Facts, in Support of Defendant Alan Silverman's Motion for Summary Judgment ("Defendant's SMF") (ECF No. 94) ¶ 1; Plaintiffs' Opposing Statement of Facts in Response to Alan Silverman's Statement of Material Facts and Additional Statement of Undisputed Material Facts ("Plaintiffs' Opposing SMF") (ECF No. 104) ¶ 1.  Hollie Noveletsky ("Noveletsky"), Ralph Noveletsky's daughter, founded Rose Steel, Inc. ("Rose"), a steel erection company, in 1983.  *Id.*[2]

---

[1] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise.  To the extent that I have incorporated one side's qualification into the statement of the other, I have determined that the qualification is supported by the record citation(s) given.  I have omitted qualifications that are unsupported by the citation(s) given or redundant.

[2] The plaintiffs object to this paragraph, as well as paragraphs 2, 4, 5, 6, 7, and 46, insofar as they rely on citations to the complaint, which they argue are not admissible in evidence.  Plaintiffs' Opposing SMF ¶¶ 1-2, 4-7, 46.  The objections are overruled.  The plaintiffs correctly note that, in *Reed v. Lepage Bakeries, Inc.*, No. 98-450-P-H, 2000 WL 761626 (D. Me. Feb. 29, 2000) (rec. dec., *aff'd in part, rejected in part on other grounds*, July 6, 2000), *aff'd*, 244 F.3d 254 (1st Cir. 2001), this court refused to credit statements of material facts supported by both the defendant's and the plaintiff's citations to an unverified complaint, reasoning that "[t]he complaint is not admissible evidence and is not an appropriate source of authority for purposes of summary judgment[,]" *Reed*, 2000 WL 761626, at *1 n.2.  However, as applied to the opposing party's statements, I decline to follow the ruling.  A statement in an opposing party's pleading qualifies as an admission, rendering it admissible for purposes of summary judgment.  *See* Fed. R. Civ. P. 56(c)(1)(A) (for purposes of summary judgment, parties may rely, *inter alia*, on "admissions"); *Barnes v. Hershey Co.*, No. C-12-1334 CRB, 2012 WL 5412031, at *2 (N.D. Cal. Nov. 6, 2012) ("[A]dmissions in an opposing party's pleadings are admissible evidence and can serve as a basis for summary judgment."); *Allen v. United States*, CV No. 03-01358-DAE-RJJ, 2012 WL 1424167, at *5 n.3 (D. Nev. Apr. 24, 2012) *recon. denied,* 2012 WL 5497887 (D. Nev. Nov. 13, 2012) ("Plaintiff's factual allegations in the complaint are admissions which are admissible evidence for summary judgment.").

Ralph Noveletsky died in December 1999, leaving an estate of almost $13 million and an estate tax liability of $6 million. *Id.* ¶ 2. The estate had liquidity and resources to pay taxes, but voluntarily entered into a 10-year payment plan with the Internal Revenue Service ("IRS"). *Id.*[3] At Ralph Noveletsky's death, all of Novel's shares went into the Novel Iron Works Trust, which was to remain in place for 10 years. Plaintiffs' Additional Statement of Undisputed Material Facts ("Plaintiffs' Additional SMF"), commencing on page 13 of Plaintiffs' Opposing SMF, ¶ 35; Defendant's Reply SMF ¶ 35. Noveletsky was allocated 51 percent of the property of the Novel Iron Works Trust, and her sister Leila was allocated 49 percent. *Id.* ¶ 36. By January 2010, Noveletsky owned 100 percent of Novel. *Id.*[4]

Noveletsky, born on August 29, 1959, is the holder of a Ph.D. in advanced nursing and the sole owner and chief executive officer of both Novel and Rose, both of which are C corporations. Defendant's SMF ¶ 3; Plaintiffs' Opposing SMF ¶ 3[5]; Plaintiffs' Additional SMF ¶ 18; Defendant's Reply SMF ¶ 18. In recent years, Novel's sales have ranged from $25 to $30 million per year, and Rose's sales are in the range of $3 million per year. *Id.* ¶ 20.

In the aftermath of her father's death, Noveletsky wanted to avoid putting her son and only child, Joshua Rosenthal, in the same situation that she had faced at her father's death – insufficient liquid assets to pay a parent's estate taxes. Defendant's SMF ¶ 4; Plaintiffs' Opposing SMF ¶ 4. Noveletsky turned to Francine Temkin, her best friend, ex-sister-in-law, and "trusted person in life," for help with "estate planning" to plan for the inheritance of the family businesses by Rosenthal. Plaintiffs' Additional SMF ¶ 41; Defendant's Reply SMF ¶ 41. Temkin is the sister of Noveletsky's ex-husband, Paul Rosenthal, whom Noveletsky divorced in

---

[3] My recitation incorporates the plaintiffs' qualification.
[4] My recitation substitutes Silverman's qualification, which more faithfully reflects the underlying record material.
[5] My recitation incorporates the plaintiffs' qualification.

1989. *Id.* ¶¶ 11-12. Temkin has been a life insurance agent employed by Metropolitan Life Insurance Company ("MetLife") since January 1978, with the exception of the period from November 1983 through January 1989. Defendant's SMF ¶ 6; Plaintiffs' Opposing SMF ¶ 6.[6]

Temkin told Noveletsky that her situation was too complex. Plaintiffs' Additional SMF ¶ 43; Defendant's Reply SMF ¶ 43. Temkin asked Silverman, a life insurance agent also employed by MetLife, to take the lead in procuring an insurance policy on Noveletsky's life. Defendant's SMF ¶ 7; Plaintiffs' Opposing SMF ¶ 7. Temkin told Silverman that Noveletsky was looking to do estate planning. Plaintiffs' Additional SMF ¶ 44; Defendant's Reply SMF ¶ 44. Temkin suggested to Noveletsky that she meet with Silverman because that is what he did. *Id.*[7]

Silverman has been employed by MetLife for 23 years. *Id.* ¶ 1. He started at MetLife as an account representative and was promoted to senior account executive. *Id.* He has held a certified public accountant ("CPA") designation since July 1983 but has not practiced as a public accountant since December 1986. Defendant's SMF ¶ 9; Plaintiffs' Opposing SMF ¶ 9. He has never been a lawyer. *Id.* From 2001 to the present, Silverman has been a Massachusetts licensed CPA, a Chartered Life Underwriter ("CLU"), a chartered financial consultant, and a Certified Financial Planner ("CFP"), in addition to being registered to sell securities. Plaintiffs' Additional SMF ¶ 2; Defendant's Reply SMF ¶ 2. He markets himself under the name "Silverman Wealth and Income Strategies" and provides services to clients in the nature of wealth and income strategies. *Id.* ¶ 3. He previously marketed himself under the name "Silverman Estate Planning and Financial Group" and provides estate planning and financial services to clients. *Id.* ¶ 4. To the present, Silverman holds himself out to the public as a

---

[6] My recitation incorporates the plaintiffs' qualification.
[7] My recitation incorporates Silverman's qualification.

certified public accountant, using the "CPA" designation on his website and in his advertising materials.  *Id.* ¶ 5.

Before April 2001, Silverman had never met, heard of, or had any communication at all with Noveletsky, Rosenthal, or Heaney.  Defendant's SMF ¶ 8; Plaintiffs' Opposing SMF ¶ 8. He never met or had any communication at all with Rosenthal until July 2012.  *Id.*  He is not related by blood, marriage, or otherwise to Noveletsky, Rosenthal, or Heaney.  *Id.*

Silverman first spoke with Noveletsky in or about May 2001 to ask for some financial documents, which Noveletsky provided.  Plaintiffs' Additional SMF ¶ 47; Defendant's Reply SMF ¶ 47.  Prior to his first in-person meeting with Noveletsky, on May 11, 2001, Silverman decided to recommend a "Life 98" policy to her.  Plaintiffs' Additional SMF ¶ 48; Deposition of Alan L. Silverman ("Silverman Dep.") (ECF Nos. 94-8 & 94-9), attached to Defendant's SMF, at 77, 92-93.[8]  The Life 98 policy required a premium payment of $66,750 per year each year through the insured's 98th birthday (or until her death, if sooner), but, depending on the dividends paid by the policy, the owner would not necessarily have to make those premium payments out of pocket.  Plaintiffs' Additional SMF ¶ 49; Defendant's Reply SMF ¶ 49.[9]

Before Silverman's first meeting with Noveletsky, he was already locating a trusts lawyer who could draft a trust for Noveletsky.  *Id.* ¶ 50.  Silverman contacted Joseph Comeau of Wealth and Tax Advisory Services in Boston.  *Id.*  Comeau recommended that attorney John Hughes handle Noveletsky's estate planning.  *Id.*[10]  Silverman received direct communications from Hughes and spoke with him directly before recommending him to Noveletsky.  *Id.* ¶ 84.

_____

[8] Silverman denies this statement on the basis that it is misquoted and that he testified only that he "had some sense" that the Life 98 policy was appropriate for Noveletsky.  Defendant's Reply SMF ¶ 48.  However, Silverman also testified that, prior to the first meeting, his judgment was that the Life 98 policy was the appropriate policy for Noveletsky, unless something changed during the meeting.  Silverman Dep. at 93.
[9] My recitation incorporates Silverman's qualification.
[10] My recitation incorporates Silverman's qualification.

The first meeting between Silverman, Temkin, and Noveletsky took place on May 11, 2001.  *Id*. ¶ 51.  At that meeting, Noveletsky shared with Silverman her concern that her dad had built a great company that she wanted to protect for her son.  *Id*. ¶ 52.  Silverman understood that Noveletsky's concern was passing Novel to Rosenthal, the third generation of Noveletskys in the business, and that another concern was the substantial estate tax liability incurred when Ralph Noveletsky died.  *Id*. ¶ 45.[11]  Silverman knew that Noveletsky's "[p]rimary objective" was to buy life insurance to pay estate taxes.  *Id*. ¶ 53.

Noveletsky thought that she wanted $5 million in insurance, but she knew very little about insurance.  *Id*. ¶ 42.  She had no idea what kind of policy made sense or even the "right" amount.  *Id*.  She testified:

> I came wanting to address the issue of the tax liability when I died.  I was not a professional life – certified financial planner.  I did not know all the issues that needed to be addressed.  And when I came to [Silverman] as he puts himself out as a certified financial planner, those issues should have been identified.  All I knew as a lay person was that I needed a death benefit to help my son when I died.  The other issues should have been addressed and brought up to my attention because I did not know what I did not know.

*Id*.[12]  Noveletsky considered Silverman to be working on her behalf as a "financial planner."  *Id*. ¶ 8.[13]  Her education and experience through 2001 was in nursing.  *Id*. ¶ 14.  In 2001, she was in

---

[11] My recitation incorporates Silverman's qualification.  The plaintiffs further assert that Silverman understood that he was being engaged to make the best decision possible for Noveletsky.  Plaintiffs' Additional SMF ¶ 46.  However, as Silverman notes, Defendant's Reply SMF ¶ 46, that statement is not supported by the citation given, which reflects that Silverman testified that "Francine [Temkin] engaged me to help her make the best decision possible for her sister-in-law[,]" Silverman Dep. at 258.

[12] Silverman qualifies this statement, asserting that, when Noveletsky met him, she had already decided that $5 million in life insurance was the appropriate amount to cover her estate taxes.  Defendant's Reply SMF ¶ 42; Deposition of Hollie T. Noveletsky ("Noveletsky Dep.") (ECF Nos. 94-5 & 94-6), attached to Defendant's SMF, at 43, 61, 72, 133-34.  She told Silverman that she needed $5 million and, after asking a series of questions, he agreed that $5 million was a reasonable starting point.  Defendant's Reply SMF ¶ 42; Silverman Dep. at 22.

[13] Silverman qualifies this statement, asserting that "financial planning" is a specific term of art, that he did not provide financial planning advice to Noveletsky, and that Noveletsky came to him simply for advice on a life insurance policy on her life that would provide cash to pay her estate taxes.  Defendant's Reply SMF ¶ 8; Silverman Dep. at 66-67; Noveletsky Dep. at 39, 41, 44-45.

school finishing her post-master's certificate.  *Id.*[14]  From 1999 through at least 2001, she was not actively involved in running Rose and was not involved in running Novel, which remained in trust until 2009 and was run by others.  *Id.* ¶¶ 38-40.  Following Ralph Noveletsky's death in 1999, Noveletsky gradually stepped into his shoes, becoming the president of Novel in 2009.  *Id.* ¶ 40.[15]  Silverman was aware that Noveletsky's occupation was nursing and that she was not sophisticated on the subject of life insurance.  *Id.* ¶ 15.[16]

The services that Silverman provided to Noveletsky included "[w]ealth planning, estate planning, [and] insurance planning."  *Id.* ¶ 6.[17]  Silverman provided Noveletsky a series of recommendations: (i) not to buy term insurance, (ii) to buy a whole life policy, (iii) to establish an irrevocable life insurance trust ("ILIT"), and (iv) to see Hughes to prepare a trust.  *Id.* ¶ 83.[18] As set forth in greater detail below, Noveletsky ultimately did engage Hughes to draft an ILIT, the Joshua W. Rosenthal Irrevocable Trust ("Rosenthal Trust" or "Trust"), Defendant's SMF ¶ 13; Plaintiffs' Opposing SMF ¶ 13, and Francine Temkin, as trustee of the Trust, thereafter purchased the Life 98 policy on Noveletsky's life that is the subject of this suit, *id.* ¶¶ 22-23, 29. Silverman considered Noveletsky to be a client, indirectly, "up until the creation of the trust and the issuance of the policy in the name of the trust."  *Id.* ¶ 7.[19]

---

[14] Silverman qualifies this statement, Defendant's Reply SMF ¶ 14, asserting, *inter alia*, that, since 1983, Noveletsky has been the chief executive officer of Rose, a structural steel erection company with about 40 employees, and she is familiar with numbers and spreadsheets, Noveletsky Dep. at 291-92; Deposition of Thomas Heaney ("Heaney Dep.") (ECF No. 94-11), attached to Defendant's SMF, at 23.

[15] My recitation incorporates Silverman's qualification.

[16] Silverman qualifies this statement, asserting that he also was aware that Noveletsky had bought and owned life insurance in the past.  Defendant's Reply SMF ¶ 15; Silverman Dep. at 113.

[17] Silverman qualifies this statement, Defendant's Reply SMF ¶ 6, asserting, in cognizable part, that he did not provide Noveletsky with financial planning or business succession planning, Silverman Dep. at 66-68, had no involvement with Noveletsky's companies, Novel or Rose, *id.* at 68, and referred Noveletsky to Comeau of Wealth and Tax Advisory Services in Boston, *id.* at 12-13, and to attorney Hughes for estate planning, *id.* at 22, 75-76.

[18] My recitation incorporates Silverman's qualification.

[19] My recitation partially incorporates Silverman's qualification.  Silverman further states that at the time of the creation of the Trust, for Noveletsky's own benefit, any client relationship needed to and did cease.  Defendant's Reply SMF ¶ 7; Silverman Dep. at 10.  Because Noveletsky was not the owner of the MetLife policy, Silverman (*continued on next page*)

Silverman did not discuss or present any insurance options aside from whole life and term.  Plaintiffs' Additional SMF ¶ 85; Defendant's Reply SMF ¶ 85.  He told Noveletsky that she "would only have to pay for 10, maybe 12 years max and the policy would pay for itself out of its dividends."  *Id*. ¶ 63.[20]  Silverman never disclosed to Noveletsky that MetLife offered universal life policies.  *Id*. ¶ 60.  Having never raised the subject, Silverman necessarily did not tell Noveletsky that universal life premiums would have been half as expensive as whole life premiums or that universal life premiums are flexible; the same premium is not due every year. *Id*.[21]  Silverman never presented the universal life option to Temkin as trustee of the Rosenthal Trust, either.  *Id*. ¶ 61.[22]

Taxes are an important part of estate planning, wealth preservation, and business succession planning.  *Id*. ¶ 72.  Silverman considered the effect of the gift tax exclusion in connection with the advice that he gave Noveletsky.  *Id*. ¶ 73.  He recommended an ILIT as an estate planning tool to limit estate taxes.  *Id*. ¶ 75.  Such trusts are a tool for business succession and estate tax planning.  *Id*.

At the meeting with Noveletsky and Temkin on May 11, 2001, Silverman recommended that Noveletsky consult with an estate planning attorney about setting up an ILIT, for tax purposes, which would own a $5 million life insurance policy insuring Noveletsky's life.

---

could not disclose information about the policy to her except with the trustee's permission.  Defendant's Reply SMF ¶ 7; Silverman Dep. at 171-72.  The Trust instrument forbade Noveletsky to exert any control over Trust assets or to have any incidents of ownership of Trust assets.  Defendant's Reply SMF ¶ 7; Exh. A (ECF No. 93-1) to Joint Record (ECF No. 93), ¶ 17.A.

[20] Silverman qualifies this statement, asserting that Noveletsky did not recall Silverman promising or guaranteeing that only 10 or 12 annual payments would need to be paid out of pocket, and she testified that Silverman said something to the effect that the amount paid in dividends would depend on the economy, just as her business does. Defendant's Reply SMF ¶ 63; Noveletsky Dep. at 63.

[21] Silverman qualifies paragraph 60, Defendant's Reply SMF ¶ 60, stating that the MetLife policy was sold not to Noveletsky but to Temkin as trustee of the Trust, Defendant's SMF ¶¶ 23, 25, 29; Plaintiffs' Opposing SMF ¶¶ 23, 25, 29, and that Temkin was already familiar with the availability of universal life policies, Deposition of Francine Temkin ("Temkin Dep.") (ECF No. 94-7), attached to Defendant's SMF, at 84.

[22] Silverman qualifies this statement, asserting, in cognizable part, that Temkin was already familiar with universal life policies.  Defendant's Reply SMF ¶ 61; Temkin Dep. at 84.

Defendant's SMF ¶ 10; Plaintiffs' Opposing SMF ¶ 10.  In conjunction with this recommendation, Silverman provided the name of Hughes, a trusts and estates lawyer who would be competent to draft the ILIT.  *Id*. ¶ 11.  Hughes has been Noveletsky's estate planning attorney since their first meeting in May or June 2001.  *Id*. ¶ 12.  Mary Lank, CPA, has been Noveletsky's personal accountant and the account for Novel and Rose since 1982, for which she presently receives an annual retainer of $56,000.  *Id*.

Noveletsky told Silverman that she could not pay an annual premium on the order of the $66,000 figure he presented, and Silverman's response was to say that the company would pay it. Plaintiffs' Additional SMF ¶ 76; Defendant's Reply SMF ¶ 76.  Silverman knew that Noveletsky was not going to take the premium out of her ordinary salary and that she did not have sufficient income or cash to make the premium payment.  Plaintiffs' Additional SMF ¶ 77; Silverman Dep. at 187-89.[23]  Silverman and Noveletsky discussed what the source of payment of the premiums might be.  Plaintiffs' Additional SMF ¶ 78; Defendant's Reply SMF ¶ 78.  Having the company distribute funds to Noveletsky, which she would then give to the Rosenthal Trust in an amount sufficient to pay the premium, was part of that discussion.  *Id*.[24]

Silverman knew that the premium payments would be made using after-tax dollars.  *Id*. ¶ 79.  He was familiar with using a split-dollar process to fund life insurance.  *Id*. ¶ 80.  He is aware of no reason why it could not have been used to pay premiums in Noveletsky's case.  *Id*. The process would have saved taxes.  *Id*.  Silverman never disclosed to Noveletsky that she could have used a split-dollar process for the company to pay premiums.  *Id*. ¶ 81.  Silverman did

---

[23] Silverman denies this, Defendant's Reply SMF ¶ 77, but I view the evidence in the light most favorable to the plaintiffs, as nonmovants.
[24] My recitation substitutes Silverman's qualification, which more faithfully reflects the underlying cited record material.

not discuss or present any information about the income tax consequences or gift tax consequences of paying premiums through the company.  *Id*. ¶ 82.[25]

To pay premiums, Noveletsky had her wholly owned business, Rose, pay her bonuses to make gifts to the Rosenthal Trust sufficient to cover premiums owed on the policy as well as income taxes on the bonus – the bonus was trued-up to pay taxes.  *Id*. ¶ 107.[26]

In 2001, Silverman was aware that Novel was in a trust and that Leila Noveletsky, Noveletsky's sister, was the other beneficiary of that trust.  *Id*. ¶ 55.  In 2001, Silverman was aware that, if Noveletsky were to die during the 10-year period of the trust, Rosenthal would become the beneficiary of Noveletsky's share of the trust.  *Id*. ¶ 56.  If Noveletsky died while the company was in trust, Silverman thought that Noveletsky would not have owed any estate taxes.  *Id*. ¶ 57.[27]  Noveletsky did not need life insurance to pay estate taxes while Novel was in trust.  *Id*. ¶ 58.[28]

Silverman told Noveletsky to submit a trial application to MetLife to get an underwriting decision.  *Id*. ¶ 86.  But it was the intention at that time that the policy actually be purchased by a trust.  *Id*.  Silverman filled out the May 2001 application for a MetLife Life 98 whole life policy.  *Id*. ¶ 87.[29]  Silverman did not provide to Noveletsky a copy of the May 2001 application.  *Id*. ¶ 88.[30]  The next step after Silverman and Temkin submitted Noveletsky's application was to

---

[25] Silverman qualifies paragraphs 80 through 82, asserting, *inter alia*, that the decision as to which company would fund the gifts (Rose) and what method would be used ("grossed-up" annual bonuses to Noveletsky) was made by Lank and Heaney.  Defendant's Reply SMF ¶¶ 80-82; Deposition of Mary M. Lank ("Lank Dep.") (ECF No. 94-12), attached to Defendant's SMF, at 73, 94, 98, 117, 127-28, 133; Heaney Dep. at 55-57.

[26] My recitation incorporates Silverman's qualification.

[27] Silverman qualifies this statement, asserting that he did not think, under the circumstances, that Noveletsky's share of Novel under the 10-year trust would have been included in her estate, but he referred her to Comeau for advice on that question.  Defendant's Reply SMF ¶ 57; Silverman Dep. at 12-13.

[28] Silverman purports to qualify this statement, Defendant's Reply SMF ¶ 58, but his qualification is unsupported by any record citation and, hence, is disregarded.

[29] My recitation incorporates Silverman's qualification.

[30] Silverman qualifies this statement, asserting that if a proposed insured requests a copy of a trial application, he provides one.  Defendant's Reply SMF ¶ 88; Silverman Dep. at 118.

have her disclose her medical records and undergo a medical exam for the underwriting process. *Id*. ¶ 89.  On July 19, 2001, MetLife made the decision to rate Noveletsky as a "standard" risk. *Id*. ¶ 90.  MetLife underwriting conveyed that decision to Silverman that same afternoon.  *Id*. Silverman never told Noveletsky that she had been rated standard instead of preferred.  *Id*. ¶ 91.[31]

## B.  Creation of the Rosenthal Trust

Silverman told Noveletsky that the trust needed to be executed so that a new application could be submitted to MetLife, this time to be signed by Temkin as trustee.  *Id*. ¶ 93.[32]  Hughes drafted the Rosenthal Trust.  Defendant's SMF ¶ 13; Plaintiffs' Opposing SMF ¶ 13.  On July 26, 2001, Silverman met with Noveletsky at Temkin's office to execute the Rosenthal Trust. Plaintiffs' Additional SMF ¶ 94; Defendant's Reply SMF ¶ 94.  Silverman witnessed Noveletsky's signature on the trust.  *Id*.  Silverman is not sure whether he presented any illustration to Noveletsky during their July meeting. *Id*. ¶ 95.[33]

Temkin was the trustee of the Rosenthal Trust from the date of its establishment on July 26, 2001, until she was succeeded as trustee by Heaney, the executive vice-president of Novel, on September 1, 2011.  Defendant's SMF ¶ 14; Plaintiffs' Opposing SMF ¶ 14; Plaintiffs' Additional SMF ¶ 17; Defendant's Reply SMF ¶ 17.  Neither Noveletsky nor Silverman has ever been a trustee of the Rosenthal Trust.  Defendant's SMF ¶ 15; Plaintiffs' Opposing SMF ¶ 15.

---

[31]  The plaintiffs further assert that Silverman did not disclose this to Noveletsky despite his knowledge that Noveletsky would pay more as a result of MetLife's rating decision.  Plaintiffs' Additional SMF ¶ 91.  However, Silverman notes that it was the trustee who paid the premiums on the MetLife policy, not Noveletsky, and that, on or about August 28, 2001, Noveletsky received a letter from the MetLife underwriter advising her that the premium for the MetLife policy did not represent the most favorable risk class available, but an appropriate risk class based on her medical information.  Defendant's Reply SMF ¶ 91; Defendant's SMF ¶¶ 26, 28; Plaintiffs' Opposing SMF ¶¶ 26, 28.

[32]  My recitation incorporates, in part, Silverman's qualification.

[33]  Silverman qualifies this statement, Defendant's Reply SMF ¶ 95, asserting that, on July 12, 2001, he prepared an illustration of the proposed MetLife policy, Joint Record Exh. F, which he presented and discussed with Noveletsky either at their meeting on July 26 or at their meeting on August 9, 2001, Silverman Dep. at 133, 135.

At all times, the primary beneficiary of the Rosenthal Trust has been, and is, Rosenthal.  *Id*. ¶ 16. Noveletsky has never been a beneficiary of the Rosenthal Trust.  *Id*. ¶ 17.  By virtue of the Rosenthal Trust instrument, she "relinquished every interest of any nature, present or future, in the Trust estate."  *Id*.

Under the Rosenthal Trust instrument, each time Noveletsky or anyone else made a gift of money to the Rosenthal Trust, Rosenthal had the right to withdraw a certain amount of that money during a specified period of time after the gift was made.  *Id*. ¶ 18.  Under the Rosenthal Trust instrument, the trustee has never been required to make any life insurance premium payments in general or to any particular life insurance company, including MetLife, or to apply any portion of Noveletsky's gifts to the Rosenthal Trust toward the payment of life insurance premiums.  *Id*. ¶ 19.  Noveletsky has never been under any legal obligation either to make any gifts to the Rosenthal Trust or to pay premiums on the MetLife policy.  *Id*. ¶¶ 20-21.

On August 9, 2001, Silverman met for a third time with Noveletsky to get a check to bind the coverage.  Plaintiffs' Additional SMF ¶ 96; Defendant's Reply SMF ¶ 96.  Prior to the meeting, Silverman had filled out the August application.  *Id*.  The meeting was short.  *Id*. Silverman explained the reason why he was asking for a premium check for the first month to bind coverage, even though the intention was to pay premiums annually.  *Id*.

On August 9, 2001, in her capacity as trustee of the Rosenthal Trust, Temkin signed the application for the MetLife whole life insurance policy insuring Noveletsky's life that is the subject of this lawsuit.  Defendant's SMF ¶ 22; Plaintiffs' Opposing SMF ¶ 22.  Temkin, as trustee of the Rosenthal Trust, signed the application to be the owner of the MetLife policy, and Noveletsky signed the application as the proposed insured.  *Id*. ¶ 23.  Temkin, as trustee of the Rosenthal Trust, and Noveletsky, as the proposed insured, also signed the "Certification of

Trustee and Proposed Insured." *Id*. ¶ 24.  The effective date of the MetLife policy was August 28, 2001, and Silverman delivered the policy to Temkin on September 11, 2001.  *Id*. ¶ 25.

On July 12, 2001, Silverman generated a pre-sale "illustration" in connection with the MetLife policy that was proposed to be issued to the Trust.  *Id*. ¶ 34.  Temkin signed the 7/12/2001 illustration on August 9, 2001.  *Id*. ¶ 35.  The 7/12/2001 illustration contains a spreadsheet showing, under the heading "Guaranteed" and the subheading "Ann'lzd Contract Premium," a column of numbers showing that the annual contract premium of $66,750 would have to be paid every year.  *Id*. ¶ 36.  The same spreadsheet in the 7/12/2001 illustration shows, under the heading "Non-Guar. Current Div. Scale" and the subheading "Net Outlay," a series of 10 annual premium payments of $66,750, and under the heading "Non-Guar. Reduced Div. Scale" and the subheading "Net Outlay," a series of 12 annual premium payments of $66,750. *Id*.

On July 12, 2001, and at all times thereafter, Temkin understood that MetLife made no guarantee that the owner of the MetLife policy would not have to make out-of-pocket premium payments for more than 10 years or 12 years.  *Id*. ¶ 38.  At all times between the issuance of the MetLife policy on August 28, 2001, and her resignation as trustee on September 1, 2011, Temkin as trustee of the Trust was the owner of the MetLife policy, and the Trust was the beneficiary of the policy.  *Id*. ¶ 29.  At all times during her tenure as trustee of the Trust, Temkin understood that (i) the annual premium for the MetLife policy would have to be paid every year until Noveletsky died or reached age 98, *id*. ¶ 30, (ii) any dividends paid by MetLife on the MetLife policy could be applied toward the payment of the annual premium, *id*. ¶ 31, (iii) the payment of dividends by MetLife on the MetLife policy was not guaranteed, *id*. ¶ 32, and (iv) the use of

dividends paid by MetLife on the MetLife policy could ultimately reduce the number of years over which the Trust would have to pay annual premiums out of pocket, *id.* ¶ 33.

### C. Events Leading to Temkin's Resignation as Trustee

After meeting with Silverman and Temkin on August 9, 2001, for the signing of the application for the MetLife policy, Noveletsky had no substantive discussions of any kind with Temkin regarding the Rosenthal Trust or the MetLife policy until February 2009, when she may have spoken to Temkin about the Rosenthal Trust skipping a premium payment shortly before speaking by telephone with Silverman about the same subject. *Id.* ¶ 39.

After meeting with Silverman and Temkin on August 9, 2001, for the signing of the application for the MetLife policy, Noveletsky had no contacts or communications of any kind with Silverman until February 2009, when she asked him (after first calling Temkin) what the ramifications would be of the Rosenthal Trust not making the annual premium payment on the MetLife policy in 2009. *Id.* ¶ 40. Silverman told her that skipping a payment would push out the number of premiums due by one year. Plaintiffs' Additional SMF ¶ 111; Defendant's Reply SMF ¶ 111. At that point, eight premium payments had already been made. *Id.* ¶ 112. Noveletsky told Silverman that she expected 10 years of premium payments. *Id.* ¶ 113. Although Silverman knew that dividends paid by MetLife on whole life policies had been coming down and that the policy would then require 14 out-of-pocket premium payments after Noveletsky skipped a premium payment, he did not tell Noveletsky that she was facing four additional premium payments beyond the planned-for 10. *Id.* ¶ 114. Silverman cannot recall mentioning the subject. *Id.*[34]

---

[34] Silverman qualifies paragraph 114, asserting that, from August 2001 until August 2011, Noveletsky never asked any questions of Temkin or of him concerning the duration of premium payments by the Rosenthal Trust. Defendant's Reply SMF ¶ 114; Noveletsky Dep. at 83-84.

Silverman communicated with Temkin, trustee, roughly annually about getting together with Noveletsky, although he has no notes documenting any such conversations. *Id.* ¶ 108. Neither Silverman nor Temkin contacted Noveletsky to suggest a meeting to go over the policy or the Rosenthal Trust. *Id.* ¶ 109.[35]

Silverman received a commission from MetLife in the amount of $42,609.28 in connection with the sale of the Noveletsky policy. *Id.* ¶ 98. He knew that Temkin was sharing in the commission; he completed a field representative's report showing that she was getting half of the commission on the sale of the policy. *Id.* It was never disclosed to Noveletsky that Temkin was sharing the commission. *Id.* ¶ 99.[36] MetLife policy in 2001 prohibited its agents from serving as trustees except in cases of close family and with written permission. *Id.* ¶ 101.[37] Silverman never disclosed to, or sought approval from, MetLife compliance for Temkin to receive a commission despite knowing that MetLife recommended that its employees not serve as fiduciaries for non-family members. *Id.* ¶ 100.[38]

Noveletsky never made any payment to Silverman or compensated him in any way for services rendered in connection with the establishment of the Rosenthal Trust or the sale of the MetLife policy to the Rosenthal Trust, or anything else. Defendant's SMF ¶ 27; Affidavit of Alan L. Silverman (ECF No. 94-13), attached to Defendant's SMF, ¶ 8. Silverman's only compensation was the commission paid to him by MetLife. *Id.*[39] Noveletsky never paid any

---

[35] Silverman qualifies paragraphs 108 and 109, asserting that, on an annual basis, Temkin would tell him that Noveletsky did not want to have a meeting to discuss the policy, and Temkin was the one who contacted Noveletsky each year. Defendant's Reply SMF ¶¶108-09; Silverman Dep. at 171-73.

[36] Silverman qualifies this statement, asserting that Noveletsky supposedly learned for the first time at the meeting on August 9, 2011, that Temkin had received a commission and that he does not know whether that fact was earlier disclosed to her. Defendant's Reply SMF ¶ 99; Temkin Dep. at 142-43; Silverman Dep. at 150, 262.

[37] My recitation incorporates Silverman's qualification.

[38] My recitation incorporates Silverman's qualification.

[39] The plaintiffs purport to deny this statement, Plaintiffs' Opposing SMF ¶ 27, but their assertions do not controvert it.

premiums on the MetLife policy.  Defendant's SMF ¶ 28; Plaintiffs' Opposing SMF ¶ 28.  All premium payments to MetLife were made by Temkin as trustee of the Rosenthal Trust.  *Id*.[40]

Between July 12, 2001, and August 1, 2011, the dividends paid by MetLife on its whole life insurance policies in general, and the MetLife policy in particular, declined.  *Id*. ¶ 41.  In the spring of 2011, a group insurance broker named George Blaisdell was referred to Noveletsky by a friend to assist with Novel's and Rose's 401(k) plan.  *Id*. ¶ 42.  Blaisdell offered to look over Noveletsky's life insurance policy.  *Id*.  At his suggestion, Noveletsky convened a meeting at Novel on August 9, 2011, that was attended by herself, Blaisdell, two Novel officers (Heaney and Marc Cox), Silverman, and Temkin.  *Id*.[41]

For the first time at the August 9, 2011, meeting, Noveletsky learned that Temkin had a role as an insurance agent in connection with the sale of the policy, and that the payments required to keep the Life 98 policy in force for a $5 million benefit were off track.  Plaintiffs' Additional SMF ¶ 117; Defendant's Reply SMF ¶ 117.[42]

In preparation for the August 9, 2011, meeting, MetLife prepared several in-force illustrations of the MetLife policy.  Defendant's SMF ¶ 43; Plaintiffs' Opposing SMF ¶ 43.  One of those illustrations, which Silverman disclosed to Noveletsky at the August 9, 2011, meeting, revealed that, at the current dividend rate, the Rosenthal Trust would have to continue making out-of-pocket premium payments for longer than the 10 years or 12 years illustrated in the 7/12/2001 illustration.  *Id*.  The 2011 illustration showed that, if the current dividend scale remained unchanged, a total of 17 premium payments would be required, as opposed to the 10 or

---

[40] The plaintiffs qualify this statement, asserting that Noveletsky made gifts to the Trust in order for premiums to be paid, and the trustee was able to pay those premiums only because Noveletsky received a bonus from Rose sufficient to fund the gifts to the Trust.  Plaintiffs' Opposing SMF ¶ 28; Noveletsky Dep. at 27.

[41] My recitation incorporates the plaintiffs' qualification.

[42] Silverman qualifies this statement, asserting that he mentioned at the meeting that the commission on the MetLife policy had been split between Temkin and himself, and he does not know whether that fact was earlier disclosed to Noveletsky.  Defendant's Reply SMF ¶ 117; Silverman Dep. at 150, 262.

12 illustrated in 2001.  Plaintiffs' Additional SMF ¶ 115; Defendant's Reply SMF ¶ 115. Because the Rosenthal Trust had skipped the 2009 payment, a total of 18 years would be required.  *Id.*[43]

Temkin resigned as trustee and was replaced by Heaney, per the terms of the Rosenthal Trust.  *Id.* ¶ 118.  Heaney made numerous attempts to discuss the Life 98 policy with MetLife, but "essentially got stonewalled."  *Id.* ¶ 119.[44]  In February 2012, Heaney canceled the MetLife policy and bought a fully paid-up universal life insurance policy on Noveletsky's life from Genworth Life Insurance Company.  Defendant's SMF ¶ 44; Plaintiffs' Opposing SMF ¶ 44. The Genworth policy was purchased using the cash value ($590,150.51) of the canceled MetLife policy, with Heaney effectuating a 1035 exchange of the MetLife policy.  *Id.*[45]

Until January 20, 2012, when Noveletsky, Heaney, and Rosenthal commenced this lawsuit, no lawsuit had been commenced against Silverman with respect to the MetLife policy. *Id.* ¶ 45.  The Amended Complaint contains 11 counts.  *Id.* ¶ 46.  Counts I, IV, and VI are not directed to Silverman.  *Id.*  In addition, the plaintiffs have abandoned their claims against Silverman in Counts IX and XI.  *Id.*

### III. Discussion

Silverman moves for summary judgment as to all counts against him on the bases that neither Noveletsky nor Rosenthal has standing to sue him and that Heaney's claims against him are time-barred.  *See* Motion at 3-13.  Alternatively, he seeks summary judgment on the basis that he is entitled to judgment as a matter of law with respect to each of the six counts asserted against him.  *See id.* at 13-28.  For the reasons that follow, I agree that neither Noveletsky nor

---

[43] My recitation incorporates Silverman's qualification, which is mischaracterized as a denial.
[44] Silverman qualifies this statement, asserting that Heaney allegedly spoke to Temkin and to other, unnamed MetLife employees, not to Silverman.  Defendant's Reply SMF ¶ 119; Heaney Dep. at 140.
[45] My recitation incorporates the plaintiffs' qualification.

Rosenthal has standing to sue Silverman and that Heaney's claims against him are time-barred.

Accordingly, I recommend that the Motion be granted. I need not, and do not, reach Silverman's

alternative arguments for summary judgment in his favor.

### A.  Whether Noveletsky Has Standing To Sue

The First Circuit has explained:

> The Constitution limits the judicial power of the federal courts to actual cases and controversies. A case or controversy exists only when the party soliciting federal court jurisdiction (normally, the plaintiff) demonstrates such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends. The standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts.

> To satisfy the personal stake requirement, a plaintiff must establish each part of a familiar triad: injury, causation, and redressability. Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.

*Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012) (citations and internal punctuation

omitted).

With respect to the first element of Article III standing, a plaintiff must demonstrate

"injury in fact," defined as "an invasion of a legally protected interest which is (a) concrete and

particularized; and (b) actual or imminent, not conjectural or hypothetical." *Id*. (citation and

internal quotation marks omitted).

Silverman argues that Noveletsky has no legally protected interest in the MetLife policy

because, to receive favorable tax treatment, she created the Rosenthal Trust and permanently

severed any control over, or interest in, the Trust's assets – namely, the MetLife policy. *See*

Motion at 7; Defendant Alan Silverman's Reply Memorandum in Support of Motion for

Summary Judgment ("Reply") (ECF No. 112) at 3.[46]  He reasons that, having done so, she "relinquished any standing to complain about the life insurance policy that was recommended by Silverman and purchased by the Trust."  *Id*. (footnote omitted).  Accordingly, in his view, the instant suit is an attempt by Noveletsky "to have her cake and eat it."  *Id*.

Silverman acknowledges that there is no Maine case on whether the grantor of an ILIT has standing to assert a claim against a life insurance agent; however, he contends that the plain language of the Trust Agreement and cases from other jurisdictions compel the conclusion that no standing exists.  *See* Motion at 5.  The plaintiffs seek to distinguish Silverman's cases but cite no authority standing for the proposition that the grantor of an ILIT retains standing to sue a life insurance agent.  *See* Plaintiffs' Memorandum in Opposition to Defendant Alan Silverman's Motion for Summary Judgment ("Opposition") (ECF No. 103) at 8-10.  They suggest, nonetheless, that Noveletsky has standing because, in 2001, Silverman provided "financial, insurance, tax, and business succession planning advice" that caused her direct harm, for example, by inducing her to make excessive cash gifts to the Trust to fund an excessive and unnecessary life insurance policy and causing her to incur needless tax liability.  *See id*. at 8.  Silverman rejoins that there is no evidence that he ever even undertook to provide such services to Noveletsky.  *See* Reply at 3-5.  To the contrary, he states, he referred Noveletsky to Comeau and Hughes, both of whom she consulted, and she also relied on her own trusted advisors, Lank and Heaney.  *See id*. at 4-5.

---

[46] An ILIT "is an effective estate planning device for sheltering life insurance proceeds from estate tax in the insured's estate."  Myron Kove, George Gleason Bogert, & George Taylor Bogert, *The Law of Trusts and Trustees*, § 1111.  "When an insured transfers a policy to an ILIT, to avoid inclusion of the insurance in the transferor's estate, he/she must transfer all of the incidents of ownership to the ILIT trustee."  *Id*.

Silverman is correct that, to the extent that Noveletsky's claims implicate the MetLife policy – for example, that the policy was unsuitable when sold, became increasingly unsuitable, and/or did not perform as expected or promised – she has no standing to sue him.  By virtue of the Rosenthal Trust instrument, Noveletsky "relinquished *every interest of any nature, present or future*, in the Trust estate."  Defendant's SMF ¶ 17; Plaintiffs' Opposing SMF ¶ 17 (emphasis added).  Noveletsky, who hired trusts and estates attorney Hughes to create the Rosenthal Trust, *see id.* ¶ 13, does not fault Silverman for advising her to create the ILIT or claim that her decision to do so was anything other than voluntary and knowing, *see generally* Complaint.  The Trust remains in existence, and the MetLife policy was part of the Trust estate at all relevant times.  Noveletsky, hence, cannot claim "an invasion of a legally protected interest" with respect to the policy.  *Katz*, 672 F.3d at 71 (citation and internal quotation marks omitted).

The language of the Trust instrument, alone, is dispositive of this point.  However, to the extent that resort to caselaw is necessary, it favors Silverman.  While no case cited by Silverman is squarely on point, the cases that he cites do indicate, as he argues, *see* Motion at 5-7, that in disputes involving ILITs, ownership of the trust property determines who may bring suit, *see, e.g., Asad v. Hartford Life Ins. Co.*, 116 F. Supp.2d 960, 962 (N.D. Ill. 2000) (noting in passing, in "vanishing premium" case in which trustee of ILIT sued insurance company whose agent had sold a policy to the trust, that a complaint earlier brought by the grantor of the trust was dismissed because the policy was owned by the trust); *Berardino v. Ochlan*, 2 A.D.3d 556, 556-57 (N.Y. App. Div. 2003) (plaintiff trustee of ILIT could not base suit against life insurance agent on agent's alleged failure to disclose information to his father, the creator of the ILIT, when the father was not a plaintiff and would not have standing to sue because he was not an owner of the policy; "It is the plaintiff, as trustee, who purchased the policy and who has title to

the trust property and fiduciary obligations with respect to the property.") (citation omitted); *Rock v. Pyle*, 720 A.2d 137, 139, 142 (Pa. Super. Ct. 1998) (requirement that appellant contribute to ILIT established on behalf of his children was insufficient to confer standing to demand an accounting from the ILIT's trustee; appellant "failed to establish any stake in the trust account for which he seeks an accounting as [his] contributions to the trust are designated as irrevocable gifts"); *Sanders v. Citizens Nat'l Bank of Leesburg*, 585 So.2d 1064, 1065-66 (Fla. Dist. Ct. App. 1991) (appellant had no standing to sue for bank's alleged conduct as trustee of ILIT when it was "well recognized that the settlor of an irrevocable trust who has retained no beneficial interest in the trust *res* has no right of action against the trustee for either breach of the trust or breach of contract[,]" with exceptions that did not apply); *see also, e.g., Rosenthal v. Nierenberg*, No. 09 Civ. 8237(NRB), 2010 WL 3290994, at *4 (S.D.N.Y. Aug. 10, 2010) (retired partner did not have a legally protected right to assignment of a life insurance policy on his life, and hence lacked standing to sue insurance agent, when the partnership agreement did not require the maintenance of life insurance on a retired partner).[47]

The plaintiffs contend that Noveletsky has standing because Silverman did more than merely sell an insurance policy, instead providing financial, insurance, tax, and business succession planning advice directly to Noveletsky that caused her harm. *See* Opposition at 8. Yet, the "standing inquiry is claim-specific[.]" *Katz*, 672 F.3d at 71. What matters is whether Noveletsky has standing to press her claims, however characterized, given her renunciation of

---

[47] More recently, according to my research, a Maryland court held, for reasons similar to those articulated in the cases cited by Silverman, that the settlor of an ILIT lacked standing to sue his insurance broker for breach of contract with respect to insurance policies transferred to the ILIT. *See Address v. Millstone*, 56 A.3d 323, 331-32 (Md. Ct. Spec. App. 2012) (noting that, "according to its express terms, the trust agreement divest[ed] [the settlor] of any interest in the trust").

any interest in the Trust estate – the MetLife policy.  A review of the claims at issue reveals that the answer is no.

Seven counts are pressed against Silverman: Count I (breach of duty of loyalty in violation of the Maine Uniform Trust Code, 18-B M.R.S. § 101 *et seq*. – conflict of interest and self-dealing), Count II (breach of fiduciary duty – sale of policy/product selection), Count III (breach of fiduciary duty in violation of the Maine Uniform Trust Code, 18-B M.R.S. § 101 *et seq*. – imprudent administration of Trust), Count V (negligence), Count VII (violation of the Maine Unfair Trade Practices Act, 5 M.R.S. § 207 *et seq*.), Count VIII (misrepresentation), and Count X (unjust enrichment).  *See* Exh. H (ECF No. 93-8) to Joint Record; Complaint ¶¶ 106-32, 140-44, 153-69, 175-78.

The MetLife policy is central to all of these counts.  Each alleges that Silverman breached duties owed to Noveletsky and the other plaintiffs in connection with the selection, sale, funding, performance, and/or administration of the MetLife policy.  *See* Complaint ¶¶ 106-32, 140-44, 153-69, 175-78.[48]  Because Noveletsky relinquished any interest in the Trust estate, which at all relevant times consisted of the MetLife policy, she has no standing to bring any of these claims.

---

[48]  Specifically, Count I alleges that Temkin, as trustee of the Trust, had a conflict of interest and engaged in self-dealing in connection with the sale of the MetLife policy, *see* Complaint ¶¶ 107-16, Count II alleges, in relevant part, that Silverman failed to recommend or secure a suitable life insurance policy or to keep Noveletsky informed of the policy's performance*, see id*. ¶¶ 118-24, Count III alleges, in relevant part, that Silverman failed to reevaluate the suitability of the MetLife policy over time, keep Noveletsky informed of its performance, and manage the policy as a prudent trustee would have done, *see id*. ¶¶ 130-32, Count V alleges, in relevant part, that Silverman failed to take reasonable care to advise Noveletsky and breached his duty to procure a policy consistent with Noveletsky's goals, *see id*. ¶¶ 141-44, Count VII alleges, in relevant part, that, as a result of Silverman's deceptive and misleading practices, Noveletsky chose an insurance policy that did not meet her goals and was excessively costly, *see id*. ¶¶ 154-61, Count VIII alleges, in relevant part, that Silverman intentionally or negligently failed to disclose material facts to Noveletsky both when the policy was purchased and when it remained in force, including facts regarding alternative insurance policies, the significant income and estate tax losses caused to Noveletsky by premium payments on the MetLife policy, and the policy's drastic underperformance as compared with initial representations, *see id*. ¶¶ 164-69, and Count X alleges, in relevant part, that Silverman retained a benefit, in the form of commissions, greater than it would have been had Noveletsky been sold a suitable life insurance policy, *see id*. ¶¶ 176-78.

### B.  Whether Rosenthal Has Standing To Sue

Silverman next contends that Rosenthal, as a mere trust beneficiary, lacks standing to sue him.  *See* Motion at 7-8.  He observes that, as a general matter, the right to sue with respect to matters affecting a trust beneficiary vests in the trustee as representative, a proposition for which he cites *Heslin v. Metropolitan Life Ins. Co.*, 287 A.D.2d 113, 114 n.1 (N.Y. App. Div. 2001), and *Nevin v. Union Trust Co.*, 1999 ME 47, ¶ 41, 726 A.2d 694, 701.  *See id.*

In *Heslin*, police officers and certain members of their families sued MetLife and one of its agents for inducing them to purchase life insurance policies based on false representations that policy premiums would vanish after a certain period of time.  *See Heslin*, 287 A.D.2d at 114.  The court held that three individuals lacked standing to commence the action as none had purchased any of the subject policies.  *See id.* at 114 n.1.  In *Nevin*, the Law Court upheld the Superior Court's dismissal of claims by beneficiaries of a decedent's estate against law firm defendants, reasoning:

> A number of the jurisdictions that have addressed the issue have determined that individual named beneficiaries of a will have standing to bring professional negligence claims against attorneys representing estates or preparing estate documents.
>
> When there is a personal representative to assert the financial claims on behalf of the estate, however, the better rule appears to be not to allow individual beneficiaries to assert claims for negligence.  Otherwise, it is possible that a number of individual beneficiaries could assert differing and conflicting malpractice claims, and attorneys, in drafting wills and estate planning documents, could be presented with difficult challenges resolving conflict of interest issues with respect to named beneficiaries at times when they are drafting the documents. . . . .  Accordingly, we conclude that individual beneficiaries do not have standing to sue estate planning attorneys for malpractice when they are not the client who retained the attorney and when the estate is represented by a personal representative who stands in the shoes of the client.

*Nevin*, 1999 ME 47, ¶¶ 40-41, 726 A.2d at 701 (citations omitted).

The plaintiffs make three points in response.  First, they contend that, to the extent that Silverman damaged the Trust, Rosenthal as beneficiary has standing to sue him.  *See* Opposition at 10.  For this proposition they cite *Taylor v. Maile*, 201 P.3d 1282, 1287 (Idaho 2009), in which the court stated, *inter alia*, that "beneficiaries [can] maintain a cause of action against the trustee, a third party, or both where the third party receives trust property with knowledge that the transfer is in violation of the trustee's fiduciary duty."  *Id.* (quoting *Maile*, 201 P.3d at 1287).  Second, they argue that *Nevin* is distinguishable in that the concern raised by the Law Court regarding conflicting claims of beneficiaries is not present here because Rosenthal is the sole beneficiary of the Rosenthal Trust.  *See* Opposition at 10-11.  Finally, they contend that it is premature to find that Rosenthal lacks standing because he may or may not need to press his claims against Silverman, depending on whether his claims are duplicative of those of Heaney or whether any of the defendants asserts defenses as to Heaney that do not apply to Rosenthal.  *See id.* at 11.

Silverman has the better argument.  Heaney, a named plaintiff, is the trustee of the Rosenthal Trust, which owns the MetLife policy.  From all that appears, the interests of Heaney and Rosenthal are aligned.  In these circumstances, *Nevin* suggests that Heaney, but not Rosenthal, should be recognized as having standing to sue on behalf of the Trust.  *See also, e.g., In re Sharif*, 457 B.R. 702, 723 (Bankr. N.D. Ill. 2011) ("[A] trust beneficiary generally does not have standing to sue third parties absent the wrongful refusal of the trustee to do so.").  Nothing in *Maile* calls this conclusion into question.  The plaintiffs do not explain how the commission that Silverman received from MetLife on the sale of the policy could qualify as Trust property, and it is not otherwise apparent how it could.  There is no evidence that Silverman received anything else that could qualify as such.

Finally, the adjudication of the standing question is not premature.  "Standing under Article III is, of course, a threshold issue in every case before a federal court, and diversity claims are no exception."  *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 892 (10th Cir. 2011) (citation and internal quotation marks omitted); *see also, e.g., Baena v. KPMG LLP*, 453 F.3d 1, 4 (1st Cir. 2006) ("Objections based on 'standing' must be addressed at the threshold if they implicate [a court's] authority to hear a case under Article III of the Constitution.").  The plaintiffs, whose burden it is to prove Rosenthal's standing, *see, e.g.*, *Katz*, 672 F.3d at 71, have fallen short of doing so.

## C.  Whether Heaney's Claims Are Time-Barred

Silverman seeks summary judgment with respect to the claims of the remaining plaintiff, Heaney, on the basis that those claims are time-barred.  *See* Motion at 8-13.  He reasons that all of the plaintiffs' claims against him accrued during the four months that he was involved in the selection and procurement of the MetLife policy, ending no later than the delivery of that policy to Temkin on September 11, 2001, and the applicable six-year general statute of limitations, 14 M.R.S.A. § 752, expired on Temkin's watch on September 11, 2007, almost four years before this suit was commenced.  *See* Motion at 9.  He contends that the statute of limitations was not tolled either by a "discovery rule" or by 14 M.R.S.A. § 859, which applies when a cause of action is fraudulently concealed or a claim is itself grounded on fraud.  *See id*. at 9-13.  The plaintiffs rejoin that there is a triable issue as to whether a "discovery rule" applies in this case and whether Silverman collaborated with Temkin to fraudulently conceal material facts about the MetLife policy, triggering 14 M.R.S.A. § 859.  *See* Opposition at 11-17.  Again, Silverman has the better argument.

### 1.   Does a "Discovery Rule" Apply?

For purposes of the running of a Maine statute of limitations, the Law Court "pegs the time of claim accrual at the time the plaintiff sustains a judicially cognizable injury." *Rared Manchester NH LLC v. Rite Aid of N.H. Inc.*, No. 2:10-cv-00203-GZS, 2011 WL 4005304, at *10 (D. Me. Sept. 6, 2011) (rec. dec., *aff'd* Oct. 14, 2011), *aff'd*, 693 F.3d 48 (1st Cir. 2012) (citation and internal quotation marks omitted). "This is described as the moment when a wrongful action produces an injury for which a plaintiff is entitled to seek vindication." *Id.* (citation and internal quotation marks omitted).

"Usually a cause of action sounding in contract accrues when the contract was breached and a cause of action sounding in tort accrues when the plaintiff sustains harm to a protected interest." *Id.* (citation and internal quotation marks omitted). However, in certain situations, Maine applies a discovery rule that "dates accrual of a cause of action . . . from the date when the [wrongdoing] is, or reasonably should have been, discovered." *Anderson v. Neal*, 428 A.2d 1189, 1190 (Me. 1981). "The legislative recognition of the need for a discovery rule of accrual in certain situations, *see, e.g.*, 14 M.R.S.A. § 752-A, does not preclude [the Law Court] from giving judicial recognition to such a need in others." *Id.*[49]

The plaintiffs tacitly acknowledge that there is no applicable *statutory* discovery rule. *See* Opposition at 11-16. They seek to avail themselves of a discovery rule recognized by the Law Court with respect to fiduciaries providing financial management services, arguing that there is a triable issue as to whether Silverman provided such services to the Trust and, hence,

---

[49] Pursuant to 14 M.R.S.A. § 752-A, "[a]ll civil actions for malpractice or professional negligence against architects or engineers duly licensed or registered under Title 32 shall be commenced within 4 years after such malpractice or negligence is discovered, but in no event shall any such action be commenced more than 10 years after the substantial completion of the construction contract or the substantial completion of the services provided, if a construction contract is not involved." 14 M.R.S.A. § 752-A.

incurred fiduciary obligations toward it.  *See id*.  Yet, as Silverman notes, *see* Motion at 10, the Law Court has not recognized a discovery rule in the context of claims arising from the sale of insurance policies.  That, in itself, cautions against the recognition of such a rule by this court, sitting in diversity.  *See Erlich v. Ouellette, Labonte, Roberge & Allen, P.A.*, 637 F.3d 32, 36-37 (1st Cir. 2011) (declining to recognize a discovery rule with respect to claims against auditors and actuaries; noting, "Departures from Maine's date-of-injury rule are rare.  They have involved careful balancing between competing interests of fairness and repose, and the opinions have not always been unanimous. . . .  We think further departures of this magnitude are best left to the state.") (footnote omitted); *see also, e.g*., *Rared*, 693 F.3d at 54 ("Where, as here, a party asserting a state-law claim eschews an available state forum in favor of a federal forum, it scarcely can be heard to complain when the federal court follows existing state precedent and refrains from blazing a new and more adventurous jurisprudential trail.").

In any event, as Silverman persuasively argues, application of the Law Court's own jurisprudence would preclude it from recognizing a discovery rule on these facts.  *See* Motion at 10.  The Law Court has held that application of the discovery rule "is appropriate only when there exists a fiduciary relationship between the plaintiff and defendant, the plaintiff must rely on the defendant's advice as a fiduciary, and the cause of action was virtually undiscoverable absent an independent investigation that would be destructive of the fiduciary relationship."  *Nevin*, 1999 ME 47, ¶ 25, 726 A.2d at 699.  The plaintiffs fail to raise a triable issue with respect to either prong of this test.

Pursuant to Maine law, a fiduciary relationship is "something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance ordinarily exercised."  *Bryan R. v. Watchtower Bible & Tract Soc'y of*

*N.Y., Inc*., 1999 ME 144, ¶ 18; 738 A.2d 839, 846 (citation and internal quotation marks omitted).  The mere existence of a business relationship, such as creditor-debtor, mortgagor-mortgagee, landlord-tenant, and, importantly for these purposes, insurance agent-client, does not suffice.  *See, e.g., Rared*, 2011 WL 4005304, at *8; *Jamshab v. Nationwide Ins. Co*., No. 04-50-P-C, 2004 WL 3007089, at *9 (D. Me. Dec. 29, 2004) (rec. dec., *aff'd in part, rejected in part on other grounds*, Feb. 22, 2005); *see also, e.g., Taylor v. Ford Motor Co*., Civil No. 06-69-B-W, 2006 WL 2228973, at *4 (D. Me. Aug. 3, 2006) ("The ordinary buyer-seller relationship, even where the seller has superior bargaining power and knowledge, is not a fiduciary one.").  "What is required is additional evidence related to the actual placement of an uncommon trust in another that creates not only a disparity of position or influence, but a great disparity; the kind of disparity that arises from diminished emotional or physical capacity or the letting down of all guards and bars."  *Rared*, 2011 WL 4005304, at *8 (citation and internal punctuation omitted).  Where, as here, "the relationship of the parties is not as a matter of law fiduciary in nature, the burden is on the party asserting the relationship to prove its existence."  *Fleet Nat'l Bank v. H & D Entm't, Inc*., 926 F. Supp. 226, 242 (D. Mass.), *aff'd*, 96 F.3d 532 (1st Cir. 1996).

There is no evidence that Temkin reposed this kind of trust in Silverman or that there was a disparity of this magnitude between them.  While Temkin told Noveletsky that her situation was too complex, *see* Plaintiffs' Additional SMF ¶ 43; Defendant's Reply SMF ¶ 43, and asked Silverman to take the lead in procuring an insurance policy on Noveletsky's life, *see* Defendant's SMF ¶ 7; Plaintiffs' Opposing SMF ¶ 7, Temkin, like Silverman, was a longtime MetLife insurance agent, *see id*. ¶¶ 6-7.  It is undisputed that, at all times during her tenure as trustee of the Trust, Temkin understood that (i) the annual premium for the MetLife policy would have to be paid every year until Noveletsky died or reached age 98, *id*. ¶ 30, (ii) any dividends

paid by MetLife on the MetLife policy could be applied toward the payment of the annual premium, *id*. ¶ 31, (iii) the payment of dividends by MetLife on the MetLife policy was not guaranteed, *id*. ¶ 32, and (iv) the use of dividends paid by MetLife on the MetLife policy could ultimately reduce the number of years over which the Trust would have to pay annual premiums out of pocket, *id*. ¶ 33.

Nor does the record, even viewed favorably toward the plaintiffs, establish that Silverman provided financial management services to the Trust.  While Silverman held CPA and CFP designations, marketed himself under the name "Silverman Wealth and Income Strategies," and provided services to clients in the nature of wealth and income strategies, *see* Plaintiffs' Additional SMF ¶¶ 2-3; Defendant's Reply SMF ¶¶ 2-3, he has not practiced as a public accountant since December 1986, *see* Defendant's SMF ¶ 9; Plaintiffs' Opposing SMF ¶ 9, and there is no evidence that he performed any services for the Trust apart from recommending and selling the MetLife policy that became part of the Trust estate and, thereafter, checking in with Temkin roughly annually about getting together with Noveletsky, which Temkin conveyed that Noveletsky did not want to do.  *See* Plaintiffs' Additional SMF ¶ 108; Defendant's Reply SMF ¶ 108.[50]

---

[50] The plaintiffs assert that "Silverman continued to provide insurance services to Temkin during her tenure as trustee." Plaintiffs' Additional SMF ¶ 110.  I have not included that statement in my recitation of the facts because, as Silverman observed in response, *see* Defendant's Reply SMF ¶ 110, it is not supported by the cited portion of his deposition.  In the cited excerpt, Silverman did not use the word "services" or identify any particular insurance services that he performed.  Rather, he testified that, up to 2011, he maintained his role as the insurance agent with respect to the Trust, *see* Silverman Dep. at 182, but denied that he provided any financial planning services, *see id*. at 183 ("As an insurance agent insurance is a component of a financial plan, but it's a specific component, and that was my extent of my relationship.  There are no other assets in the trust.  The only asset in the trust is that insurance policy.  That would have been the scope of my relationship with Francine as trustee.").  In any event, even if I were to credit the statement that Silverman provided ongoing "insurance services" to Temkin, doing so would not raise a triable issue as to whether he became a fiduciary with respect to the Trust. *See, e.g.*, *Jamshab*, 2004 WL 3007089, at *9 ("At most, the evidence in the summary judgment record indicates that the relationship between Basu and Jamshab was simply that between an individual seeking a life insurance policy and an insurance sales agent.  If there is no 'special relationship' for purposes of the existence of a fiduciary duty between a church and one of its members under Maine law, there is certainly nothing about the relationship between Basu and Jamshab, so far as (*continued on next page*)

This case, thus, is materially distinguishable from *Nevin*, in which the Law Court found that a bank became a fiduciary when it played a significant role in the ongoing management of a client's financial affairs for more than 15 years, including recommending the creation of a corporation and the transfer of real estate into the corporation and the taking of a durable power of attorney that gave it authority to manage the client's business, corporate, and financial affairs. *See Nevin*, 1999 ME 47, ¶¶ 27-28, 726 A.2d at 699-700.

For these reasons, there is no triable issue as to whether Silverman owed fiduciary duties to the Trust that would warrant application of the discovery rule.

Even assuming *arguendo* that the plaintiffs adduced sufficient evidence to create a triable issue of fact with respect to the first prong of the "discovery rule" test, they fall short of doing so with respect to the second prong: whether "the cause of action was virtually undiscoverable[.]" *Id*. at ¶ 25, 699.  The MetLife policy was delivered to Temkin on September 11, 2001, *see* Defendant's SMF ¶ 25; Plaintiffs' Opposing SMF ¶ 25, and, on August 9, 2001, she signed a copy of a pre-sale illustration indicating that premiums on the policy would have to be paid every year and that dividends were not guaranteed, *see id*. ¶¶ 35-36.  On July 12, 2001, and at all times thereafter, Temkin understood that MetLife made no guarantee that the owner of the MetLife policy would not have to make out-of-pocket premium payments for more than 10 or 12 years. *See id*. ¶ 38.  While Silverman did not present a universal life option to Temkin, *see* Plaintiffs' Additional SMF ¶ 61; Defendant's Reply SMF ¶ 61, she was already familiar with that option, *see* Defendant's Reply SMF ¶ 61; Temkin Dep. at 84.

When, as here, a cause of action can be discovered by recourse to a written agreement or insurance illustration, it is not virtually undiscoverable.  *See, e.g., Rared*, 2011 WL 4005304, at

may reasonably be discerned from the summary judgment record, that would allow one to infer that such a special relationship existed in this case.") (citation omitted).

*11 ("[I]t cannot be said that the existence of the prescription drug exclusion was *unknowable* to Rared.  After all, the words were written on the face of the lease.") (emphasis in original); *Chiapetta v. Clark Assocs.*, 521 A.2d 697, 700 (Me. 1987) ("There was nothing inherently unknowable about the lack of coverage since it was an aspect of the contract of insurance.")

The plaintiffs, accordingly, cannot avail themselves of a discovery rule to toll the statute of limitations applicable to Heaney's claims against Silverman.

### 2.   Does 14 M.R.S.A. § 859 Apply?

With a stated exception not applicable here, 14 M.R.S.A. § 859 provides:

> If a person, liable to any action mentioned, fraudulently conceals the cause thereof from the person entitled thereto, or if a fraud is committed which entitles any person to an action, the action may be commenced at any time within 6 years after the person entitled thereto discovers that he has just cause of action[.]

14 M.R.S.A. § 859.

"Title 14 M.R.S.A. § 859 offers two separate bases for tolling the statute of limitations." *Chiapetta*, 521 A.2d at 700.  "A plaintiff may invoke section 859 if either the defendant has fraudulently concealed from the plaintiff the existence of a cause of action or the plaintiff's claim is itself grounded on fraud."  *Id*.  "In either instance, the statute starts to run only when the plaintiff discovers or in the exercise of due diligence and ordinary prudence should have discovered the existence of the cause of action or fraud."  *Id*.

Silverman states, and the plaintiffs do not dispute, that the only fraud that they allege Silverman committed was his alleged "vanishing premium" representation to Noveletsky: that she would be able to complete her premium payments under the policy in 10 to 12 years.  *See* Motion at 13 (citing Complaint ¶¶ 4, 52); Opposition at 16-17.  However, the plaintiffs do not allege, and the evidence does not show, that Silverman defrauded *Temkin*, as trustee of the

Rosenthal Trust.  To the contrary, as discussed above, Temkin was aware at all relevant times that a "vanishing premium" was not guaranteed.

The plaintiffs do not deny this, but protest that "[i]t cannot be true that the presence of an insider benefitting from the misrepresentations defeats a claim of concealment[,]" and "[f]raudulent concealment also arises as a result of the special relationship between Silverman and the Trust."  Opposition at 17.  The plaintiffs cite no authority in support of the first point.  In any event, the question presented is whether Silverman fraudulently concealed a cause of action *from the Trust*.  I perceive no reason why any fraudulent misrepresentation made by Silverman to Noveletsky should be attributed to the Trust in these circumstances, in which Noveletsky relinquished any interest of any nature, present or future, in the Trust estate.  With respect to the second point, for the reasons discussed above, the plaintiffs have not adduced sufficient evidence to create a triable issue as to whether there was a "special relationship" between Silverman and the Trust.

The plaintiffs, accordingly, cannot avail themselves of 14 M.R.S.A. § 859.  In the absence of any applicable tolling mechanism, Heaney's claims against Silverman are time-barred.

## IV.  Conclusion

For the foregoing reasons, I recommend that Silverman's motion for summary judgment as to all claims against him be **GRANTED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

***Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review
by the district court and to appeal the district court's order.***

Dated this 15th day of February, 2013.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge
