# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| HOLLIE T. NOVELETSKY, THOMAS HEANEY, and JOSHUA W. ROSENTHAL, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 2:12-cv-00021-NT |
| | ) | |
| METROPOLITAN LIFE INSURANCE COMPANY, INC., FRANCINE TEMKIN, and ALAN L. SILVERMAN, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON PARTIES' CROSS-MOTIONS
## FOR SUMMARY JUDGMENT

Before the Court are four motions for summary judgment: (1) Defendant Francine Temkin's motion for summary judgment (ECF No. 175); (2) Defendant Alan Silverman's second motion for summary judgment (ECF No. 178); (3) Defendant Metropolitan Life Insurance Company, Inc.'s ("**MetLife**") motion for summary judgment (ECF No. 182); (4) and Plaintiffs Thomas Heaney and Joshua Rosenthal's cross-motion for partial summary judgment against Defendant Temkin (ECF No. 191). For the reasons that follow, the Defendants' motions for summary judgment are **GRANTED,** and the Plaintiffs' cross-motion for partial summary judgment is **DENIED.** Additionally, the Defendants' *Daubert* motions (ECF Nos. 174, 180, 183, 220, 221, 222) are **GRANTED IN PART**. The remainder of the objections raised in the Defendants' *Daubert* motions and all the objections raised in the Plaintiffs' *Daubert* motion (ECF No. 176) are **DENIED AS MOOT**.

# FACTUAL BACKGROUND

In 1999, Hollie Noveletsky's father died, and she and her sister inherited their father's structural steel fabrication company, Novel Iron Works. SSMF ¶¶ 1-2.[1] Noveletsky already owned her own steel erection company, Rose Steel, Inc. SSMF ¶¶ 2, 5; PSMF ¶ 22. At the time of her father's death, his estate was valued at almost $13 million, but Novel Iron Works lacked the liquidity to pay the $6 million in estate taxes owed. SSMF ¶¶ 1, 3. The estate entered an agreement with the IRS to pay off the tax debt incrementally over ten years. SSMF ¶¶ 1, 5. Noveletsky wanted to make sure that her own son, Joshua Rosenthal,[2] had sufficient funds to pay the estate taxes when he inherited the company after she died. SSMF ¶ 4; TSMF ¶ 7. Noveletsky told Tom Heaney, Novel Iron Works' executive vice president, that she wanted to buy $5 million of life insurance for Rosenthal. TSMF ¶ 43; PSMF ¶ 20.

Noveletsky turned to Francine Temkin for help. TSMF ¶ 8. Temkin, Noveletsky's best friend and the sister of Noveletsky's ex-husband, was a long-time

---

[1] ECF No. 211 is the consolidated statement of material facts asserted by all parties. It includes the Plaintiffs' Statement of Material Facts ("**PSMF**"), Silverman's Statement of Material Facts ("**SSMF**"), Temkin's Statement of Material Facts ("**TSMF**"), and MetLife's Statement of Material Facts ("**MSMF**"), as well as the parties' definitions, general objections, and responses and replies to all asserted facts. *See also* ECF Nos. 205, 207 (containing three replies to Plaintiffs' responses to statements of material not captured in ECF No. 211). The Court's citations to the statements of fact incorporate not only the statement being offered, but also the objections, responses, and replies to that statement, and the Court takes those facts that are undisputed or disputed but properly supported in the light most favorable to the non-moving party.

The Plaintiffs object to a number of Silverman's asserted facts because they refer for support to facts the Plaintiffs themselves proffered during Silverman's first motion for summary judgment and the Plaintiffs did not intend that these facts would be used against the Plaintiffs at a later stage of litigation. *See* SSMF ¶¶ 1-4, 10, 12-16, 19, 23. The Plaintiffs' objection is overruled. Silverman's citation to the Plaintiffs' earlier statement of material facts, which was supported with citations to the record, incorporated those record citations and provided the Plaintiffs ample notice of the basis for Silverman's proposed facts.

[2] Rosenthal, now 27 years old, was a minor until 2004. TSMF ¶ 36.

life insurance agent for MetLife. TSMF ¶ 8; PSMF ¶ 10. Temkin told Noveletsky that her situation was "too complex" for her and referred Noveletsky to Alan Silverman, a MetLife agent, as well as a chartered life underwriter and financial consultant and certified public accountant and financial planner, who did business under the names Silverman Wealth and Income Strategies and Silverman Estate Planning and Financial Group. PSMF ¶¶ 2-4, 47; SSMF ¶ 28.

Before his first in-person meeting with Noveletsky, Silverman asked Noveletsky to provide him with some of her financial records. PSMF ¶ 52. Silverman developed a sense that the MetLife Life98 life insurance policy (the "**Metlife Policy**") (ECF No. 93-2), a whole life policy with a $5 million death benefit, accumulating cash value, and variable dividends, would likely be appropriate for her. SSMF ¶¶ 8(e)-(f); PSMF ¶ 53.

Noveletsky, Silverman, and Temkin met face-to-face on May 11, 2001, and discussed Noveletsky's desire to obtain life insurance that would help her son pay the estate taxes when she died. PSMF ¶¶ 56-58. At the time, Noveltsky was a healthy 41-year-old with an actuarial life expectancy of 40 years. SSMF ¶ 6. Silverman recommended Noveletsky purchase the Metlife Policy. SSMF ¶¶ 9, 15; PSMF ¶ 54. At the meeting, Noveletsky and Silverman also discussed term life policies, which Silverman did not recommend. SSMF ¶ 8; PSMF ¶¶ 68, 98. Silverman did not present the option of universal life insurance to Noveletsky, though he knew that a generic universal life policy would have had annual premiums about half as large as those of the MetLife Policy. PSMF ¶¶ 66, 98.

Silverman told Noveletsky that under the MetLife Policy she "would only have to pay for 10, maybe 12 years max and the policy would pay for itself out of its

dividends." SSMF ¶ 17; PSMF ¶ 69. Noveletsky understood that the number of payments she would have to make depended on the economy. SSMF ¶ 17; MSMF ¶ 30.[3] Noveltsky understood Silverman to mean that she would be required to pay only for ten years in a good economy but up to twelve years in a not-so-good economy. PSMF ¶¶ 70-71.

Silverman's file contained two Life Insurance Policy Illustrations—one dated May 10, 2001, and labeled "Prepared For Hollie Noveletsky" and the other dated July 12, 2001, and labeled "Prepared For Hollie T. Noveletsky-Rosenthal." SSMF ¶ 30; MSMF ¶¶ 24, 26; May 10, 2001 Illustration ("**May Illustration**") (ECF No. 93-5); July 12, 2001 Illustration ("**July Illustration**") (ECF No. 93-6). Both illustrations give projections for the MetLife Policy, although the May Illustration assumes a preferred rating and $1 million in coverage while the July Illustration assumes a standard rating and $5 million in coverage. MSMF ¶¶ 24, 26; May Illustration 2; July Illustration 2. The illustrations show when the MetLife Policy would become self-funding at the "guaranteed" dividend scale, at the "non-guaranteed current dividend scale" being paid by MetLife, and at a "non-guaranteed reduced dividend scale." May Illustration 14-16; July Illustration 14-16. Both illustrations show the policies becoming self-funding at 10 and 12 years at current and reduced dividend scales, respectively. May Illustration at 14-16; July Illustration at 14-16. Both illustrations also show that the policies would not become self-funding until year 57 under the

---

[3] This claim is supported by citations to Noveletsky's deposition and is not properly controverted by the Plaintiffs' qualifications, so the Court accepts it as undisputed. *See* D. Me. Local R. 56(f); May 5, 2013 Dep. of Hollie Noveletsky Pt. 1 at 16 (62:10-63:21) (ECF No. 94-5).

guaranteed scale. May Illustration at 14-16; July Illustration at 14-16. Finally, both illustrations contain the following language:

> The policy is eligible for annual dividends beginning at the end of the second policy year. Dividends are based on factors such as MetLife's investment returns, taxes, persistency, claims experience (mortality) and expenses. The amount of any future dividend cannot be guaranteed and is subject to change by MetLife. Actual results may be more or less favorable than those shown.

MSMF ¶ 28; May Illustration at 2; July Illustration at 2.

Noveletsky confirmed that before the MetLife Policy was issued, in the company of Silverman and Temkin, she saw and reviewed an illustration similar in format to the July Illustration, although she could not be sure that it was the July Illustration that she had seen. MSMF ¶ 29; [4] May 5, 2013 Dep. of Hollie Noveletsky Pt. 1 at 24 (105:1-8).

Silverman also recommended that Noveletsky establish an irrevocable life insurance trust, or ILIT, to hold the policy, and he referred her to trusts attorney John Hughes to advise her. SSMF ¶¶ 11-12; PSMF ¶ 87. He also told Noveletsky to submit a trial application to MetLife on her own behalf, though it was his intention that the ILIT purchase the policy, not Noveletsky. PSMF ¶ 99. Noveletsky followed Silverman's recommendations. SSMF ¶¶ 12-13; PSMF ¶ 100.

After Noveletsky submitted the trial application, MetLife required her to disclose her medical records and undergo a medical exam in order to make an underwriting decision about how much the MetLife Policy would cost. PSMF ¶ 102.

---

[4] This claim is supported by citations to the record and is not properly controverted by the Plaintiffs' qualifications, so the Court accepts it as undisputed. *See* D. Me. Local R. 56(f); May 5, 2013 Dep. of Hollie Noveletsky Pt. 1 at 24 (94:9-105:8).

On July 19, 2001, MetLife gave Noveletsky a "standard" rating, as opposed to a "preferred" rating. PSMF ¶ 103. In accordance with that decision, MetLife set the price of the annual premiums for the MetLife policy at $66,750 a year. PSMF ¶¶ 54, 104. The premiums would have been lower had Noveletsky received a "preferred" rating. PSMF ¶ 104.

At Noveletsky's request, Attorney Hughes drafted a trust instrument (the "**Trust Instrument**") for the ILIT. SSMF ¶ 12; ECF No. 181-8. The primary purpose of the trust was to hold the life insurance policy on Noveletsky's life and to enable payment of estate taxes at Noveletsky's death. TSMF ¶ 78. The Trust Instrument included provisions purporting to excuse the Trustee from certain duties, including:

- Section 4, titled "<u>TRUSTEE'S DUTIES AND POWERS</u>," which states:

  [D]uring the time in which the assets of the trust estate consist solely of principal cash, if any, and insurance policies, the Trustee shall not be required to diversify investments nor make any investment recommendations.

Trust Instrument 7.

- Section 11, titled "<u>TRANSACTIONS WITH INTERESTED TRUSTEE</u>," which states:

  Any individual acting as a Trustee hereunder or any firm or corporation of which it is a member or employee may act as attorney for, deal and contract with, and be employed by the Trustee hereunder, and any individual acting as a Trustee hereunder may act as attorney, director, officer, agent or employee of any corporation in which the Grantor's estate or the trust is interested, directly or indirectly, as a stockholder or otherwise, all in the same manner and with the same freedom as though not a Trustee or the employee of a Trustee hereunder and without accountability for any compensation received in connection with such action.

Trust Instrument 12-13. Another provision of the Trust Instrument, § 12(A), requires the trustee to "render accounts of the administration of the trust annually." Trust Instrument 13.

Noveletsky chose Temkin to be the ILIT's trustee.[5] SSMF ¶ 13; PSMF ¶ 113; Trust Instrument 1-18. Temkin was appointed as trustee for the sole purpose of purchasing the MetLife Policy, which had already been selected by Noveletsky at the time Temkin became trustee. TSMF ¶ 116. Noveletsky, Silverman, and Temkin met on July 26, 2001 to execute the Trust Instrument. PSMF ¶ 112.

On August 9, 2001, Silverman, Temkin, and Noveletsky met again. PSMF ¶ 126. Temkin applied for the MetLife Policy on the ILIT's behalf. PSMF ¶ 147. Temkin and Noveletsky signed a certificate acknowledging that the ILIT was purchasing the MetLife Policy and that Rosenthal would be the policy's beneficiary. MSMF ¶¶ 32- 33; ECF No. 94-1. On August 9, 2001, Temkin also signed the July Illustration. MSMF ¶ 26; July Illustration at 5. The first payment to MetLife, which bound the ILIT, was paid that month. PSMF ¶ 126.

Noveletsky received and read the MetLife Policy at some point after it went into effect. MSMF ¶ 51. In a section entitled "Dividends" the policy provided:

> Every year we determine an amount to be paid to our policyholders as dividends. We will determine the share, if any, for this policy and credit it as a dividend at the end of the policy year.

---

[5] In 2001, MetLife had a policy that allowed its agents to serve as the trustee of a trust involving close family members only after a written disclosure by the agent and review by MetLife. PSMF ¶ 161. Temkin recalls requesting and obtaining permission from her supervisor at MetLife before accepting the appointment as trustee of the ILIT. PSMF ¶¶ 162-164, 166-168. As part of her employment with MetLife, Temkin signed a contract in which she agreed not to directly or indirectly perform any act or make any statement that would tend to divert from MetLife any trade or business with any customer. PSMF ¶ 13.

MetLife Policy at 5.

MetLife pays its agents a commission upon the delivery of an insurance contract to a customer. PSMF ¶ 152. The amount of the commission depends on the size of policy's premiums. PSMF ¶ 153. As co-agents on the sale of the MetLife Policy, Temkin and Silverman split an $80,000 commission. PSMF ¶¶ 155-56, 200. Noveletsky was unaware that Temkin received part of the commission. PSMF ¶ 200.

Over the next ten years, with the exception of 2009, Noveletsky made annual payments into the ILIT out of her own funds. PSMF ¶¶ 93, 175, 184, 235. Noveletsky funded the ILIT each year with the net proceeds of an approximate $120,000-$130,000 bonus payment from her company, Rose Steel. PSMF ¶¶ 93, 175, 235. The bonus payment was "grossed up" to allow Noveletsky to fund the ILIT at exactly $66,750 a year after paying income taxes on the bonus. PSMF ¶¶ 93, 175, 235. In 2009, Noveletsky's business had a bad year and she opted not to make a payment. PSMF ¶ 184.

Each year, with the exception of 2009, Temkin would receive a check for $66,750 from Noveletsky, and each year, with the exception of 2002, Temkin would send out a form known as a "Crummey letter" to Rosenthal informing him of his ability to withdraw this gift from the trust. TSMF ¶ 99; PSMF ¶¶ 184, 191. Temkin would wait thirty days and then use the gift to pay the MetLife Policy's annual premium. TSMF ¶¶ 99, 117. She sent Rosenthal no other annual accounting of the administration of the ILIT and she failed to send the Crummey letter at all in 2002. TSMF ¶ 99; PSMF ¶ 191. Temkin received no compensation for her work on the ILIT's behalf. TSMF ¶ 27.

Each year, MetLife sent annual policy statements addressed to "Francine Temkin" to Noveletsky's home. TSMF ¶ 102. When they arrived, Noveletsky would turn them over to Temkin. TSMF ¶ 45. Temkin would then give them back to Noveletsky, who would then turn them over to Heaney, unopened. TSMF ¶ 45.[6] The annual policy statements for 2004, 2009 and 2010 were admitted into the record. MetLife Annual Policy Statements for 2004, 2009 & 2010 ("**Policy Statements**") (ECF No. 181-5). Each contained information about the amount of the premium, the amount of the current death benefit, the cash surrender value, and the amount of dividend paid for that year. Policy Statements at 1-3. They also contain statements announcing that the dividend scale is lower than the prior scale. Policy Statements at 1-3. For instance, the 2004 annual statement reads: "The current dividend scale for this policy is lower than the prior scale, reflecting investment experience. . . . If you have questions regarding the effect of the dividend scale . . . , please contact your Representative or MetLife as described in the Notice below." Policy Statements at 1.

Unbeknownst to Noveletsky, dividends on the MetLife Policy began decreasing as the economy faltered in the wake of the September 11, 2001 attacks and the mortgage crisis. PSMF ¶¶ 187-189. In the spring of 2011, after consultation with George Blaisdell, an insurance broker working on Novel Iron Works' 401(k) plan,

---

[6]    Paragraph 45 of Temkin's Statement of Material Facts states as follows:

> Noveletsky received annual statements concerning the policy and turned them over to Heaney. The statements went to Franny at Noveletsky's house, she turned them to Franny, who turned them back to Noveletsky, who then gave them to Heaney.

TSMF ¶ 45 (citations omitted). The Plaintiffs deny paragraph 45, but the portion of the record they cite does not properly controvert the proposed fact. The Court therefore accepts paragraph 45 of Temkin's Statement of Material Facts as undisputed. *See* D. Me. Local R. 56(f).

Noveletsky realized that there was no cap on the number of payments needed to fund the MetLife Policy. SSMF ¶ 19. By then, the ILIT had paid nine premiums funded by Noveletsky, one each year from 2001 to 2010, except for 2009 when Noveletsky did not fund the ILIT. SSMF ¶ 18; PSMF ¶ 184; *see also* Duval Report 20-29. At then-existing rates, the policy was not expected to become self-funding until seventeen premiums had been paid. SSMF ¶ 19. Noveletsky also learned that Temkin had received half of the $80,000 commission on the MetLife Policy. PSMF ¶ 200.

Following Noveletsky's discoveries, she arranged to have Temkin replaced as the ILIT's trustee. PSMF ¶¶ 201-202. In February of 2012, the ILIT's new trustee, Thomas Heaney, surrendered the MetLife Policy and purchased a Genworth universal life insurance policy (the "**Genworth Policy**") using the $590,150.51 in cash value that the MetLife Policy had accumulated. PSMF ¶ 204; MSMF ¶ 56. The new policy provided a guaranteed death benefit, up to age 99, of $4,782,208 with no further premium payments due. SSMF ¶ 25; TSMF ¶ 56. With an additional $27,000 the ILIT could have purchased a policy with $5 million of coverage. SSMF ¶ 26.

## EXPERT TESTIMONY[7]

The Plaintiffs solicited the opinions of three experts to bolster their theories of liability and quantify their alleged damages: (1) Phillip E. Harriman, a life insurance expert; (2) John T. Gurley, a tax liability expert; and (3) John J. Duval, Jr., a damages

---

[7] Here, the Court describes only those expert opinions that are both developed in the parties' statements of material facts and relevant to the Court's disposition on the parties' motions for summary judgment. The Court does not rely on the Defendants' expert opinions and therefore does not describe them.

expert. PSMF ¶¶ 207, 224; Jan. 14, 2014 Expert Report of John J. Duval, Jr. ("**Duval Report**") (ECF No. 223-1).

Harriman opines that most trustees consider a range of insurance options before buying a policy and that Temkin and Silverman should have performed a "needs analysis" to determine the amount of insurance and type of policy appropriate for Noveletsky. PSMF ¶¶ 215-16; Aug. 27, 2012 Expert Report of Philip E. Harriman 6 ("**Harriman Report**") (ECF No. 192-2).[8] He contends that a needs analysis would have revealed that a whole life insurance policy like the MetLife Policy was inappropriate. PSMF ¶ 217; Harriman Report 7. He further asserts that the ILIT should have purchased a universal life insurance policy instead, in light of Noveletsky's goals. PSMF ¶ 217; Harriman Report 7. Harriman identified a Manulife universal life policy (the "**Manulife Policy**") that he claims was available in 2001, which would have provided Noveletsky a $5 million death benefit through the age of 99 with annual premiums of just $32,505, so long as Noveletsky secured a "preferred" rating from Manulife as opposed to the "standard" rating she received from MetLife. PSMF ¶ 223; Harriman Report 7, 11.

Gurley offers opinions regarding the tax implications of the arrangement Noveletsky entered into with MetLife and the ILIT. Oct. 4, 2012 Expert Report of John T. Gurley ("**Oct. 4, 2012 Gurley Report**") (ECF No. 180-4 at 14-24); Oct. 31,

---

[8]     The Plaintiffs' statement of material facts asserts that "Temkin and Silverman should have performed a needs analysis to determine the amount of insurance and type of policy appropriate for *the ILIT*," citing only the Harriman Report in support, and the Defendants deny the fact as unsupported. PSMF ¶ 215 (emphasis added). Harriman's report does not speak in terms of the ILIT's needs, but rather Noveletsky's. The Plaintiffs' proposed fact is therefore unsupported to the extent it refers to the needs of the ILIT as opposed to Noveletsky.

2012 Correction of John T. Gurley ("**Oct. 31, 2012 Gurley Supplement**") (ECF No. 180-4 at 25-26).

First, in what he labels Opinions 1(A) and 2(B), Gurley opines that Noveletsky would have been exposed to $115,216 less in estate tax liability and paid $202,819 less in income tax had the ILIT purchased the Manulife Policy instead of the MetLife Policy. PSMF ¶¶ 226, 230, 233. This scenario assumes that Noveletsky would have taken smaller grossed-up bonuses from Rose Steel and left the extra money in the company. PSMF ¶¶ 226, 230, 233; Oct. 4, 2012 Gurley Report 13-14, 19 ("Opinion 1(A)"); Oct. 4, 2012 Gurley Report 15-16, 20 ("Opinion 2(B)"); Oct. 31, 2012 Gurley Supplement 25-26.

Second, in what he labels Opinions 3(A) and 3(B), Gurley proposes that Noveletsky would have been exposed to $165,171 less in estate tax liability and paid $358,917 less in income tax had Noveletsky foregone any bonuses from Rose Steel and instead had Rose Steel fund the ILIT directly through a split-dollar arrangement.[9] This scenario assumes that the ILIT would have still purchased the MetLife Policy. PSMF ¶¶ 227, 230, 237; Oct. 4, 2012 Gurley Report 19-20 ("Opinion 3(A)" and "Opinion 3(B)"); Gurley Supplement 25-26.

Third, in what he labels Opinions 1(B) and 2(D), Gurley proposes that Noveletsky would have been exposed to $165,171 less in estate tax liability and paid

---

[9]     The material statements of fact do not explain precisely what a split-dollar arrangement is. However, the October 4, 2012 Gurley Report indicates that, under a split-dollar arrangement, Rose Steel would have paid the premiums on the policy "in exchange for the contractual right to receive its premiums back in the event of a death claim or first rights to the surrender value i[f] the policy was terminated before Hollie's passing." Harriman Report 8.

$393,532 less in income tax had she foregone life insurance and taken no bonuses from Rose Steel. PSMF ¶¶ 228, 230, 235; Oct. 4, 2012 Gurley Report 13-14, 19 ("Opinion 1(B)"); Oct. 4, 2012 Gurley Report 18, 20 ("Opinion 2(D)").

The Plaintiffs' final expert, Duval, used both Harriman and Gurley's expert reports to build "damage models," essentially estimates of how much more money the ILIT and Noveletsky would have had in 2012, when the ILIT surrendered the MetLife Policy, if Noveletsky and the ILIT had taken different actions from 2001 to 2010. January 14, 2014 Expert Report of John Duval 9 (the "**Duval Report**") (ECF No. 220-2). The Plaintiffs propose that two of Duval's models could be used as the basis for an award of the damages the ILIT suffered as a result of Temkin's alleged breaches of trust: (1) the "Actual Premiums + Lost Opportunity" model, which estimates that the ILIT suffered $269,785 in damages; and (2) the "Excess Premiums 2 + Lost Opportunity" model, which estimates that the ILIT suffered $441,306 in damages. PSMF ¶¶ 240-41[10]; Duval Report 4 & Exs. 3, 11; Pls.' Opp'n to Def. Temkin's Mot. for Summ. J. 4, 6-7 (ECF No. 190).

---

[10] As discussed below in the procedural history, the Plaintiffs' expert witness Lawrence Wood withdrew his services from this case in October of 2013 citing a new job which created a conflict of interest. The Court permitted the Plaintiffs to substitute the testimony of Duval for the testimony of Wood, but explained that it would "not be tolerant of any enlargement upon the *specific* topics about which Mr. Wood has opined." Order of Dec. 4, 2013 at 2 (ECF No. 173). When the Plaintiffs filed their statement of material facts in December of 2013, they had not yet received Duval's replacement opinion, and therefore used Wood's figures as stand-ins. PSMF ¶¶ 239-241 & n.2. The Plaintiffs never supplemented their statement of material facts to replace Wood's figures with Duval's. However, both Duval's expert report and the transcript of Duval's February 6, 2014 deposition were filed with the Court during the parties' *Daubert* motion practice. Duval Report; Feb. 6, 2014 Dep. of John J. Duval, Jr. (ECF No. 220-1). By referencing these materials, the Court is able to determine which of Duval's figures are logically equivalent to Wood's figures. In keeping with the spirit of the Court's Order of December 4, 2013, the Court relies on the Duval report and deposition only for the limited purpose of substituting Duval's estimates for Wood's corresponding estimates in the Plaintiffs' statement of material facts.

The Actual Damages + Lost Opportunity estimate is calculated in the following manner. The ILIT paid $600,494 in MetLife Policy premiums from 2001 to 2010 and received $590,407 back in 2012 when it surrendered the policy. Accordingly, Duval concludes, it suffered a net change in wealth of -$10,343. PSMF ¶ 241; Duval Report 4, 20-29. Next, Duval calculates that if the ILIT had still received $66,750 a year in funding from 2001 to 2010 but invested the money in a bond market index fund instead of paying the MetLife Policy premiums, its investment would have yielded $259,422 by February of 2012. PSMF ¶ 241; Duval Report 4-5, 20-29. Finally, Duval calculates the difference between the ILIT's net change in wealth (-$10,343, a/k/a "actual damages") and the amount it could have made through conservative investments ($259,422, a/k/a "lost opportunity"), to produce a final "Actual Damages + Lost Opportunity" damages estimate of $269,422. PSMF ¶ 241; Duval Report 5, 20-29.

The Excess Premiums 2 + Lost Opportunity estimate is calculated in a different way. If the ILIT had purchased the Manulife Policy, with annual premiums of $32,505, instead of the MetLife Policy, with annual premiums of $66,750, it would have paid $34,245 less in premiums each year, or a total of $308,205 less from 2001 to 2010. PSMF ¶ 239; Duval Report 8-9. Duval calculates that if the ILIT had still received $66,750 a year in funding from 2001 to 2010 and invested the $34,245 difference in annual premiums in a bond market index fund, that investment would have yielded $133,101 by February of 2012. PSMF ¶ 240; Duval Report 8-9, 69-76. Duval then calculates the sum of the premiums the ILIT paid above what would have

been required under the Manulife Policy ($308,205, a/k/a "excess premiums") and the amount the ILIT could have made through conservative investments ($133,101, a/k/a "lost opportunity") to produce an "Excess Premiums 2 + Lost Opportunity" damages estimate of $441,306. PSMF ¶ 240; Duval Report 8-9, 69-76.

### PROCEDURAL HISTORY

In January of 2012, Noveletsky, Heaney, and Rosenthal (collectively, the "**Plaintiffs**") filed a complaint (ECF No. 1) against Temkin, Silverman, and MetLife (collectively, the "**Defendants**"), asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332. They amended their complaint in July of 2012. ECF No. 40 (the "**Amended Complaint**"). Under Counts I through IV, the Amended Complaint charges Temkin with violating various fiduciary duties she owed as a trustee. Under Counts II and III, the Amended Complaint also charges Temkin and Silverman with violating fiduciary duties they owed as insurance agents and financial planners. Under Counts V, VII, VIII, IX, X, and XI, respectively, the Amended Complaint seeks to hold Temkin and Silverman liable for negligence, misrepresentation, violation of the Maine Unfair Trade Practices, breach of implied contract, unjust enrichment, and breach of the warranty of suitability. Under Count VI, the Amended Complaint alleges that MetLife negligently supervised Temkin and Silverman. Under Count VII, the Amended Complaint alleges that MetLife violated the Maine Unfair Trade Practices Act. The Amended Complaint also seeks to hold MetLife vicariously liable for Temkin and Silverman's alleged misconduct under the remaining counts.

After a case management conference, the Plaintiffs informed Silverman by letter that they were no longer pressing Counts IX and XI against him. Silverman subsequently filed a motion for summary judgment (ECF No. 95) on all the remaining counts against him on the grounds that: (1) neither Noveletsky nor Rosenthal had standing to sue him; (2) Heaney's claims against him were barred by the statute of limitations, and that no "discovery rule" applied to toll the statute of limitations; and (3) he was entitled to summary judgment as a matter of law on the merits of all the claims. The Court referred the motion to United States Magistrate Judge John H. Rich III, who issued a report and recommended decision (ECF No. 137) in February of 2013. The magistrate judge determined that Noveletsky and Rosenthal lacked standing and that Heaney's claims were time-barred and recommended granting Silverman's motion on those bases.

The Plaintiffs timely objected to the magistrate's determination with respect to Noveletsky and Heaney, and this Court reviewed the recommended decision de novo. In the Court's Order of July 14, 2013, the Court adopted the magistrate's decision in part. The Court determined that Noveletsky lacked standing to charge Silverman with wasting trust assets and therefore could not bring Count VII (the Maine Unfair Trade Practices Act claim) or Count X (the unjust enrichment claim), but that Noveletsky did have standing to sue Silverman for wrongfully inducing her to establish the ILIT in the first place, so Counts II, III, V and VIII could be brought.

The Court then proceeded to the merits of those counts. The Court determined that Noveletsky failed to demonstrate a triable issue that Silverman owed any

fiduciary duty or tort duty of care to Noveletsky in his role as an insurance agent and therefore granted summary judgment as to Noveletsky's claims against him in Counts II, III, and V.

With respect to the misrepresentation claim in Count VIII, however, the Court granted summary judgment only in part. The Court granted summary judgment as to Noveletsky's claim that Silverman fraudulently failed to disclose information, but allowed Noveletsky's claim to go forward as to her allegation that Silverman affirmatively misrepresented the nature and terms of the MetLife Policy.

The Plaintiffs subsequently represented to the Court that they were abandoning all of Noveletsky's claims against Temkin. They also represented that they were abandoning Counts IX through XI. The following chart shows which claims the different Plaintiffs continue to press against which Defendants:

|  | Noveletsky | Rosenthal | Heaney |
|---|---|---|---|
| **Count I**: Breach of Duty of Loyalty |  | MetLife; Temkin | MetLife; Temkin |
| **Count II**: Breach of Fiduciary Duty (selection and sale of policy) |  | MetLife; Temkin | MetLife; Temkin |
| **Count III**: Breach of Fiduciary Duty (imprudent administration of trust) |  | MetLife; Temkin | MetLife; Temkin |
| **Count IV**: Breach of Fiduciary Duty (failure to provide reports and keep beneficiary reasonably informed) |  | MetLife; Temkin | MetLife; Temkin |
| **Count V**: Negligence |  | MetLife; Temkin | MetLife; Temkin |
| **Count VI**: Negligent Supervision |  | MetLife | MetLife |

| | | | |
|---|---|---|---|
| **Count VII**: Violation of MUPTA | | MetLife; Temkin | MetLife; Temkin |
| **Count VIII**: Misrepresentation | Silverman; MetLife | MetLife; Temkin | MetLife; Temkin |
| **Count IX**: Breach of Implied Contract | | | |
| **Count X**: Unjust Enrichment | | | |
| **Count XI**: Breach of Warranty of Suitability | | | |

Pls.' Notice of Claims Chart. (ECF No. 159-1.)

After an October 2013 conference of counsel, the Court issued a scheduling order (ECF No. 158) to allow for the orderly filing of the current round of summary judgment and *Daubert* motions. Later that month, the Plaintiffs learned that one of their damages experts, Lawrence Wood, had taken a new job which created a conflict of interest, and the Plaintiffs moved to substitute his testimony with that of a new expert witness. The Court granted the motion over the Defendants' objections but indicated that it would "not be tolerant of any enlargement upon the *specific* topics about which Mr. Wood has opined." Order of Dec. 4, 2014 at 2. (ECF No. 173.) In the ensuing months, the parties filed the following motions:

- Defendant Silverman's second motion for summary judgment (ECF No. 178)

- Defendant Temkin's motion for summary judgment (ECF No. 175)

- Defendant MetLife's motion for summary judgment (ECF No. 182)

- The Plaintiffs' motion for partial summary judgment as to Counts I and IV against Defendant Temkin (ECF No. 191)

- The Plaintiffs' motion to exclude the expert testimony of Nancy Fannon, Theodore Affleck, and John A. Rodgers, III (ECF No. 176)

- Temkin, Silverman, and MetLife's motions to exclude the expert testimony of Philip Harriman and John Gurley (ECF Nos. 174, 180, 183)

- Temkin, Silverman, and MetLife's motions to exclude the expert testimony of John Duval, the Plaintiffs' replacement for Lawrence Wood (ECF Nos. 220, 221, 222)

The last of these motions came under advisement in March of 2014.

## LEGAL STANDARDS

### Summary Judgment Standard

The Court may grant a motion for summary judgment only where the movant shows that "there is no genuine dispute as to any material fact" and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). " 'A "genuine" issue is one that could be resolved in favor of either party.' " *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 223 (1st Cir. 2013) (quoting *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)). " '[A] "material fact" is one that has the potential of affecting the outcome of the case.' " *Id.* (same).

In deciding a motion for summary judgment, the Court construes the record in the light most favorable to the nonmovant and resolves all reasonable inferences in the nonmovant's favor. *See Jakobiec*, 711 F.3d at 223. The " 'standard is favorable to the nonmoving party, but it does not give him a free pass to trial.' " *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013) (quoting *Hannon v. Beard*, 645 F.3d 45, 48 (1st Cir. 2011)). The "party seeking to establish a genuine issue of material fact . . . must demonstrate, through submissions of evidentiary quality, that a

trialworthy issue persists." *DePoutot v. Rafaelly*, 424 F.3d 112, 117 (1st Cir. 2005). "Factual specificity is required; a conglomeration of 'conclusory allegations, improbable inferences, and unsupported speculation' is insufficient to discharge the nonmovant's burden." *Id.*

At the summary judgment phase, the Court "must not engage in making credibility determinations or weighing the evidence." *Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014). The motion should be denied if the nonmoving party's evidence is strong enough " 'to support a verdict in her favor.' "[11] *Sensing v. Outback Steakhouse of Fla., LLC,* 575 F.3d 145, 153 (1st Cir. 2013) (quoting *Calero-Cerezo,* 355 F.3d at 19).

## Expert Testimony Standard

Federal Rule of Evidence 702 assigns to this Court " 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *Smith v. Jenkins*, 732 F.3d 51, 64 (1st Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).

With regard to relevance, the Court "must determine whether the testimony 'will assist the trier of fact to understand or determine a fact in issue,' " *id.*, or if

---

[11] The evidence the Court considers is governed by the local rules of this District. *See* D. Me. Local R. 56; *Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1st Cir. 2008). "The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." D. Me. Local R. 56(f). "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by [Local Rule 56], shall be deemed admitted unless properly controverted." *Id.*

" 'there is simply too great an analytical gap between the data and the opinion proffered.' " *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). This "entails an examination" of the expert's "conclusions to determine whether they flow rationally from the methodology employed." *Id.*

With regard to reliability, the Court "considers whether 'the testimony is based on sufficient facts or data'; whether 'the testimony is the product of reliable principles and methods'; and whether 'the expert has reliably applied the principles and methods to the facts of the case.' " *Jenkins*, 732 F. 3d at 64 (quoting Fed. R. Evid. 702). But Rule 702 "demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion" and not "that a party who proffers expert testimony . . . prov[e] to the judge that the expert's assessment of the situation is correct." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998). With regard to the sufficiency of the facts and data in particular, "trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support." *Milward v. Acuity Specialty Prods. Gp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) (quoting *Ruiz-Troche*, 161 F.3d at 81). " '[E]xpert testimony may be more inferential than that of fact witnesses,' but 'an expert opinion must be more than a conclusory assertion about ultimate legal issues' " to be admissible. *RTR Techs., Inc. v. Helming*, 707 F.3d 84, 94 (1st Cir. 2013) (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993)).

## I. The Claims Against Temkin

Heaney (as trustee) and Rosenthal (as beneficiary) press seven claims against Temkin related to her part in the selection and sale of the MetLife Policy to the ILIT and to her performance of her fiduciary duties as the ILIT's trustee. They are as follows:

- **Count I:**      breach of the fiduciary duty of loyalty

- **Count II:**     breach of fiduciary duty in the selection and sale of the MetLife Policy

- **Count III:**    breach of fiduciary duty by imprudent administration of of the trust

- **Count IV:**     breach of fiduciary duty by failure to provide reports and to keep the beneficiary reasonably informed about trust administration

- **Count V:**      negligence

- **Count VII:**    violation of the Maine Unfair Trade Practices Act

- **Count VIII:**   misrepresentation

ECF No. 159-1.

Defendant Temkin seeks summary judgment on all the claims against her. Plaintiffs Rosenthal and Heaney cross-move for summary judgment on Count I and Count IV.

### A. Counts I-IV: The Breach of Trust Claims Against Temkin

The first task the Court faces in resolving the motions for summary judgment with respect to Counts I through IV is determining what law applies. This is easier said than done. The parties point to various sources: (1) Maine's common law; (2)

provisions of the Maine Probate Code, in effect from 1981 to 2005, which deal with trusts; and (3) provisions of the Maine Uniform Trust Code, which replaced the trust provisions of the Maine Probate Code and remain in effect today. The Court begins by briefly describing these sources of law and their relationship to one another.

### 1. The Governing Law

#### a. Maine's Common Law of Trusts

The common law applicable to Maine trusts can be found in the decisions of Maine's Law Court, which often rely on the Restatements pertaining to trusts. *See In re Estate of Greenblatt*, 86 A.3d 1215, 1219 (Me. 2014); *Estate of Wilde*, 708 A.2d 273, 275-76 & nn.4-5 (Me. 1998). The Restatement (Third) of Trusts defines a trust as "a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of . . . one or more persons." Restatement (Third) of Trusts § 2 (2003). The "settlor" is "[t]he person who creates a trust" (in this case, Noveletsky). *Id.* at § 3. The "beneficiary" is the "person for whose benefit property is held in trust" (in this case, Rosenthal). *Id.* The "trustee" is "[t]he person who holds property in trust" and who has the legal authority to manage and dispose of the trust's assets (in this case Temkin, succeeded by Heaney). *Id.* at §§ 3, 85. Finally, the "terms of the trust" are "the manifestation of intention of the settlor with respect to the trust provisions expressed in a manner that admits of its proof in judicial proceedings." *Id.* at § 4. A settlor will often memorialize terms of the trust in

a written trust document, as Noveletsky did here by executing the Trust Instrument. *See* I William Fratcher, *Scott on Trusts* § 4 (4th ed. 1987).[12]

The common law of trusts imposes various fiduciary duties on trustees, several of which are at issue in this case. *In re Estate of Stowell*, 595 A.2d 1022, 1025 (Me. 1991); *Estate of Wilde*, 708 A.2d at 275; Restatement (Third) of Trusts §§ 76-78, 83, 93 (2003). First, trustees have "a duty to administer the trust . . . in accordance with the terms of the trust." Restatement (Third) of Trusts § 76 (2003). Second, trustees have a duty of loyalty—"a duty to administer the trust solely in the interest of the beneficiaries," Restatement (Third) of Trusts § 78 (2003), and to avoid "holding any interest that might affect the judgment exercised on behalf of a beneficiary." *In re Estate of Lowell*, 595 A.2d 1022, 1025 (Me. 1991). Third, trustees have a duty of prudence—"a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust." Restatement (Third) of Trusts § 77 (2003); *see also Estate of Wilde*, 708 A.2d at 275. Fourth, trustees have a duty to keep beneficiaries reasonably informed about "significant developments concerning the trust and its administration, particularly material information needed . . . for the

---

[12]     *Scott on Trusts* provides the following caution:

> The reader of the Restatement of Trusts must guard against the notion that the expression *terms of the trust* is limited to express provisions contained in the trust instrument. It is used throughout the Restatement in a much wider sense. It covers the manifestation of intention of the settlor, whether expressed in words or by conduct, as gathered from all the circumstances under which the trust was created, so far as evidence of such manifestation is admissible.

I William Fratcher, *Scott on Trusts* § 4 (4th ed. 1987).

protection of their interests." Restatement (Third) of Trusts § 82 (2003); *see also Estate of Whitlock*, 615 A.2d 1173, 1178 (Me. 1992).

A trustee who violates any of these duties may be held liable for money damages. *Estate of Wilde*, 708 A.2d at 275-76. The Restatement (Third) of Trusts provides that "[a] trustee who commits a breach of trust is chargeable with" either:

> (a) the amount required to restore the values of the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered; or
>
> (b) the amount of any benefit to the trustee personally as a result of the breach.

Restatement (Third) of Trusts § 100 (2003); *accord Estate of Wilde*, 708 A.2d at 275-76.[13] Recovery for breach of trust does not necessarily require that the trust suffer a pecuniary loss. *Estate of Stowell,* 595 A.2d at 1026 (regardless of whether estate received a fair return, fiduciary's use of estate monies required him to disgorge his profits).

However, "[t]he settlor may, by provisions in the trust instrument, limit or extend" any of trust law's fiduciary duties, "at least insofar as doing so is not contrary to public policy." Mark L. Ascher, 3 *Scott & Ascher on Trusts* § 16.1 (5th ed. 2007). Put another way, most of the duties imposed by trust law are " 'default rules,' as opposed to mandatory or restrictive rules, and [are] therefore subordinate to the terms (or 'law') of the trust." Restatement (Third) of Trusts § 4 cmt. a(1) (2003).

---

[13]     The *Estate of Wilde* court formally adopted the approach to damages articulated in an earlier version of the Restatement (Third) of Trusts. *See Estate of Wilde*, 708 A.2d at 276 (quoting Restatement (Third) of Trusts § 205 (1992)). Though the language of the more recent version is clearer, there is no discernible substantive difference between the two.

"[E]ven the vital fiduciary duty of loyalty is a *default rule* that may be modified by the terms of the trust, . . . at least to the degree of allowing the settlor to eliminate strict prohibitions, such as that against self-dealing." Restatement (Third) of Trusts § 78 cmt. c(2) (2003). However, an exculpatory clause in a trust instrument is presumptively unenforceable "[i]f the terms of the trust were drafted by the trustee, or if the exculpatory clause was caused to be included in the trust by the trustee." Restatement (Third) of Trusts § 96 cmt. d (2003).

### b. The Maine Probate Code

In 1979, the Maine Legislature passed the Maine Probate Code, which codified and expanded upon certain elements of trust law, including several of the duties at issue in this case. P.L. 1979, ch. 540, § 1 (effective Jan. 1, 1981); 18-A M.R.S.A. § 7-301 (1981) (codifying the duty of loyalty); 18-A M.R.S.A. § 7-404(b) (1981) (providing that trustees lack the power to engage in self-interested transactions absent court authorization, except as provided under certain exceptions); 18-A M.R.S.A. § 7-302 (1981) (codifying the duty of prudence); 18-A M.R.S.A. § 7-303 (1981) (codifying the duty to keep beneficiaries reasonably informed). In 1995, the Legislature repealed § 7-302 of the Maine Probate Code, which had codified the duty of prudence in general terms, and replaced it with the more specific Uniform Prudent Investor Act. P.L. 1995, ch. 525; 18-A M.R.S.A. § 7-302 (2001).

Difficult interpretive questions arise in trying to harmonize the Maine Probate Code with the common law that preceded it, such as whether Code provisions should be viewed as modifiable default rules, as at common law, or unmodifiable mandatory rules. Several sources evince a preference for modifiability within the Maine Probate

Code. First, § 1-103 of the Maine Probate Code provides that "unless displaced by the particular provisions of this Code, the principles of law and equity supplement its provisions." 18-A M.R.S.A. § 1-103 (2001). Second, § 7-301 of the Maine Probate Code provides that "[e]xcept as specifically provided, the general duty of the trustee to administer a trust expeditiously for the benefit of the beneficiaries is not altered by this Code." 18-A M.R.S.A. 7-301 (2001). Third, § 7-302 of the Maine Probate Code provides that the duty to invest prudently "may be expanded, restricted, eliminated or otherwise altered by the provisions of a trust." 18-A M.R.S.A. § 7-302 (2001).[14] Section 7-302 also provides, more generally, that "[a] trustee is not liable to a beneficiary to the extent that the trustee acted in reasonable reliance on the provisions of the trust." *Id.* Fourth, Maine's law of statutory interpretation imposes a strong presumption against reading statutes to alter the common law:

> When the Legislature enacts a statute in derogation of the common law, the statute must be clear and unambiguous in its effect; 'the common law is not to be changed by doubtful implication . . . [and] a statute in derogation of it will not effect a change thereof beyond that clearly indicated either by express terms or by necessary implication.' " (quoting *Batchelder v. Realty Residential Hospitality, LLC*, 914 A.2d 1116, 1124 (Me. 2010)).

---

[14] It is possible to argue, by negative implication, that where a legislature specifically permitted an action in one context but is silent as to whether that action is permitted in a second context, it intended that the action be prohibited in the second context. This is sometimes referred to as the *inclusio unius* canon of statutory interpretation. William N. Eskridge, Jr., Philip P. Frickey, & Elizabeth Garrett, *Legislation and Statutory Interpretation* 263 (2006). Here, § 7-302 of the Maine Probate Code specifically provides that it may be modified by trust provisions, while other Maine Probate Code sections are generally silent on the issue of modifiability. However, a negative implication argument is not persuasive here. As discussed above, the version of § 7-302 of the Maine Probate Code in force in the years relevant to this case was adopted sixteen years after the other trust sections in the Maine Probate Code and is based on a separate uniform code. The fact that the Legislature addressed modifiability in 1995 with specificity sheds little light on what it intended by using less specificity over a decade and half earlier.

*State Farm Mut. Auto Ins. Co. v. Koshy*, 995 A.2d 651, 662 (Me. 2010).

### c.   The Maine Uniform Trust Code

In 2003, the Legislature repealed the trust provisions of the Maine Probate Code and enacted the Maine Uniform Trust Code in their place. P.L. 2003, ch. 218, § A-1 (effective July 1, 2005). Like the Maine Probate Code, the Maine Uniform Trust Code codified many aspects of trust law.

It also provided new guidance about how to construe Maine's statutory trust provisions in light of background common law trust principles and earlier statutory law. First, § 106 provides that "[t]he common law of trusts and principles of equity supplement" the Maine Uniform Trust Code, "except to the extent" they are "modified" by the Code or another Maine statute.  18-B M.R.S. § 106. Second, an introductory comment provides that "[t]he Uniform Trust Code is primarily a default statute," and that "most of [its] provisions can be overridden in the terms of the trust." 18-B M.R.S.A. pt. 1, ch. 1, unif. gen. cmt. (2013). A third provision, § 1104, provides that the Maine Uniform Trust Code applies to trusts created before its enactment, but does not affect acts done prior to July 1, 2005. 18-B M.R.S § 1104(1)(A), (E)

With this background in mind, the Court proceeds to the substance of the dispute concerning Rosenthal and Heaney's breach of trust claims against Temkin.[15]

---

[15]     The Court sets aside Temkin's general, non-substantive attacks on the Plaintiffs' breach of trust claims without lengthy discussion. First, the Court rejects Temkin's arguments that it lacks jurisdiction to hear trust law claims or that the Amended Complaint must be dismissed because the Maine Uniform Trust Code was not in effect in 2001. Second, though the Defendants' statute of limitations arguments may have merit, the exact contours of the applicable law remain unclear. The Defendants contend that Maine's catch-all statute of limitations applies and that neither Maine's statutory nor its judicial discovery rule warrants tolling the limitations period. *See* 14 M.R.S. § 752

### 2.  Application of the Governing Law to the Facts of the Case

### a.  Count I: Breach of the Duty of Loyalty

Count I concerns Temkin's sale of the MetLife Policy to the ILIT and her receipt of an approximate $40,000 commission on the sale. Rosenthal and Heaney contend that Temkin indisputably violated the fiduciary duty of loyalty provided for by the common law of Maine and the Maine Probate Code. *See Estate of Lowell,* 595 A.2d at 1025; 18-A M.R.S.A. §§ 7-301, 7-302(e), 7-404(b) (2001). Plaintiffs also argue that Temkin had a duty to disclose any commission that she earned. The Defendants respond that the strict prohibition against self-dealing found in the common law of Maine and the Maine Probate Code is a modifiable default rule, not a mandatory rule, and that § 11 of the Trust Instrument modified the rule to allow Temkin to sell a MetLife insurance policy to the ILIT and take a commission on the sale without any accounting to the trust. All three of these parties move for summary judgment.

As an initial matter, it is clear that Temkin's conduct would have violated the duty of loyalty in the absence of a trust provision specifically permitting her conduct. Both the common law duty of loyalty and its applicable statutory counterpart prohibit trustees from deriving "gain, benefit or advantage by the use of funds held in trust," including receiving a commission on an insurance policy sold to a trust. *In re Estate of Stowell*, 595 A.2d at 1025; 18-A M.R.S.A. § 7-302(e); Restatement (Third) of Trusts

---

(catch-all statute of limitations); 14 M.R.S. § 859 (statutory discovery rule); *Nevin v. Union Trust Co.*, 726 A.2d 694, 699 (Me. 1999) (judicial discovery rule). The Plaintiffs argue that § 1005 of Maine Uniform Trust Code entirely displaced the catch-all statute of limitations in this area and does not bar their suit. *See* 18-B M.R.S.A. § 1005. But none of the parties offers the Court a comprehensive argument about why their interpretation of the statutory landscape is correct or addresses how § 7-307 of the Maine Probate Code or § 1104(2) of the Maine Uniform Trust Code factors into the analysis. *See* 18-A M.R.S.A. § 7-307 (2001); 18-B M.R.S. § 1004(2). Because all of the Plaintiffs' claims are disposed of on other grounds, the Court need not resolve this knotty issue.

§ 78 (2003). Likewise, § 7-404(b) of the Maine Probate Code provides that, subject to certain exceptions not applicable here, the trustee may only engage in self-interested transactions with prior court authorization. 18-A M.R.S.A. 7-404(b) § (2001). It is undisputed that Temkin did not seek or receive court authorization.

However, it is also apparent that, at common law, the strict prohibition against self-dealing was a "default rule" that could be "modified by the terms of trust." Mark L. Ascher, 3 *Scott & Ascher on Trusts* § 16.1 (5th ed. 2007). Because no specific provision in the Maine Probate Code displaced this common law principle, it survived the Code's enactment. *See* 18-A M.R.S.A. §§ 1-201, 1-103; *State Farm Mut. Auto. Ins. Co. v. Koshy*, 995 A.2d 651, 662 (Me. 2010). Additionally, it is undisputed that Noveletsky's attorney, John Hughes, drafted the Trust Instrument, not Temkin or anyone acting on Temkin's behalf, so Heaney and Rosenthal are not entitled to a presumption that exculpatory clauses in the Trust Instrument are unenforceable. Accordingly, the restrictions found in § 7-302(e) and § 7-404(b) of the Maine Probate Code must yield to contrary provisions in the Trust Instrument to the extent they reasonably limit the Code's reach and do not violate public policy.[16]

Section 11, the provision of the Trust Instrument which Temkin points to, provides as follows:

> TRANSACTIONS WITH INTERESTED TRUSTEE. Any individual acting as a Trustee hereunder or any firm or corporation of which it is a

---

[16] The Plaintiffs argue that the Law Court's decision in *Estate of Spear*, a case construing 18-A M.R.S.A. § 7-404(b), commands another result. However, that case presented the entirely distinct question of whether, in the *absence* of a trust provision excusing self-dealing, a court may ratify a sale of property from a trust to a trustee after the fact. *Estate of Spear*, 689 A.2d 590, 590-91 (Me. 1997). The *Estate of Spear* court did not address whether the common law assumption that trust law rules may be modified by the terms of the trust survived the passage of the Maine Probate Code. *Id.*

member or employee may act as attorney for, deal and contract with, and be employed by the Trustee hereunder, and any individual acting as a Trustee hereunder may act as attorney, director, officer, agent or employee of any corporation in which the Grantor's estate or the trust is interested, directly or indirectly, as a stockholder or otherwise, all in the same manner and with the same freedom as though not a Trustee or the employee of a Trustee hereunder and without accountability for any compensation received in connection with such action.

Trust Instrument 12-13.

Section 11's meaning is informed by its caption, which tells the reader that it concerns transactions with interested trustees. The fair interpretation of the words that follow is that they allow an individual serving as trustee of the ILIT (such as Temkin) to "deal and contract with" a trustee (Temkin, again) "all in the same manner and with the same freedom" as though "not a Trustee," "without accountability for any compensation received in connection with such action." Trust Instrument 12-13. Properly construed, § 11 relaxes the duty of loyalty's strict prohibition on self-dealing to allow trustees to deal with themselves as if they were dealing with a third party not affiliated with the trust. On the facts of this case, § 11 had the limited effect of allowing Temkin to buy the MetLife Policy from herself and take a commission on the sale without reporting the compensation she received.[17] Put another way, it allowed Temkin to deal with herself with "the same freedom" as though she were not self-interested, but not with *more* freedom. If Temkin had

---

[17]     Generally, a trustee has no duty to report how sales agents the trust deals with are compensated by their employers, as this detail is not "significant" to the trust or its administration. *See* Restatement (Third) of Trusts § 82 (2003); 18-A M.R.S.A. § 7-303 (2001). As § 11 allowed Temkin to deal with herself "with the same freedom" as if she were not on both sides of the transaction, she had no duty to report her own commission.

violated her duty to exercise good faith and reasonable diligence in purchasing the MetLife Policy, § 11 would offer her no protection.

This narrow interpretation of § 11 does not violate public policy. Instead, it accords with the nature of the ILIT as a single-asset trust from which Temkin did not expect extensive or strict duties and from which she took no compensation. On these facts, Temkin is entitled to summary judgment on Count I.

### b. Count II: Breach of Fiduciary Duty in the Selection of the MetLife Policy

Count II of the Amended Complaint alleges that Temkin violated her fiduciary duties in the selection and purchase of the MetLife Policy by failing to: (1) "undertake an insurance needs analysis to validate the need for $5 million in coverage before selling a participating whole life policy"; (2) "recommend and procure a suitable policy given the insured's objective of maximizing the death benefit at the lowest possible premium cost"; (3) "structure the policy such that dividends would be applied to reduce premium costs"; and (4) "secure a 'preferred' rating for the insured that would have saved the insured premium costs and enhanced the value of the Trust, or, at least, to have advised the insured to contact alternative insurers for an offer."[18] Am. Compl. ¶ 122. Temkin moves for summary judgment on the basis that the Plaintiffs

---

[18] The Plaintiffs also now contend that they are entitled to relief under Count II because: (1) Temkin should have "corrected Silverman's misrepresentation to Noveletsky concerning the number of payments required to fund the MetLife Policy"; (2) Temkin "should have considered a range of options, not just the MetLife Policy Silverman recommended"; (3) the MetLife Policy was not "the appropriate policy under the circumstances"; and (4) "Temkin should have disclosed that Noveletsky had been rated as 'standard' risk rather than a 'preferred' risk and either shopped around with other insurers for a better risk rating or engaged in advocacy with MetLife to secure the best available risk rating for Noveletsky, reducing the cost of insurance to the ILIT." Pls.' Opp'n to Def. Temkin's Mot. for Summ. J. 24-25).

failed to demonstrate genuine issues of material fact as to whether Temkin committed a breach of trust and whether the ILIT or its beneficiaries are entitled to any damages.[19]

### i. Breach of Trust

The Court must assess the Plaintiffs' claim in light of the following uncontroverted facts. Before Noveletsky installed Temkin as the ILIT's trustee, she told Temkin that her overall goal was to pass on her wealth to her son without saddling him with a large estate tax bill. Though Noveletsky knew little about insurance, she thought that securing a $5 million life insurance policy would meet her goals. Noveletsky asked Temkin for advice, but Temkin told Noveletsky that her situation was too complex and referred her to Silverman. At Silverman's suggestion, Noveletsky submitted an application for the MetLife Policy and retained an attorney to set up an ILIT to hold the policy. Noveletsky had already selected the MetLife

---

[19]     Temkin's additional arguments—that the Trust Instrument and the Maine Probate Code specifically permitted her actions and exonerated her against claims for breaching the duty of prudence—add little to the discussion. Section 4(P) of the Trust Instrument empowers a trustee to "rely upon . . . any statement or representation made by any fiduciary as to the assets comprising this trust estate . . . ." Trust Instrument 9. But even if Temkin can show she relied on Silverman's representations, Silverman was not in a fiduciary relationship to the ILIT, so this section does not apply. *See Noveletsky v. Metropolitan Life Ins. Co.*, No. 2:12-cv-00021-NT, 2013 WL 2945058, at *4-8 (D. Me. June 14, 2013). Section 8 of the Trust Instrument provides that a trustee has no liability "for any loss or depreciation in the value of any property in any trust created herein, whether due to an error of judgment or otherwise, where the Trustee has exercised good faith and ordinary diligence in the exercise of its duties." Trust Instrument 12. But this section simply mirrors the common law rule that a trustee who exercises "reasonable care and skill" and "does not otherwise commit a breach of trust" is not liable for an unsuccessful investment performance. Restatement (Third) of Trusts § 99 cmt. b (2003); see also *Estate of Wilde*, 708 A.2d at 275. It provides no special shield against liability. Finally, § 7-402(c)(24) provides trustees with the power "[t]o employ persons . . . , even if they are associated with the trustee, to advise or assist the trustee in the performance of his administrative duties" and "to act without independent investigation upon their recommendations." 18 M.R.S.A. § 7-402(c)(24) (2001). But Temkin did not "employ" Silverman—she did not pay him for his advice. Accordingly, § 7-402(c)(24) does not apply.

Policy when Temkin was appointed trustee, and Temkin was appointed for the sole purpose of purchasing the MetLife Policy.

Rosenthal and Heaney's Count II claims rely on the premise that Temkin took on a duty, as of the end of July 2001, to check Silverman and Noveletsky's work and engage in a rigorous process, from scratch, to ensure that the ILIT was not buying more insurance than Noveletsky needed, despite the fact that Temkin had already told Noveletsky she lacked the expertise to do so. This premise is not supported by the record.

As an initial matter, once Noveletsky established the ILIT—an irrevocable trust she disavowed any personal interest in—the fiduciary duties it engendered ran to the ILIT and Rosenthal, its beneficiary, not to Noveletsky. Temkin had no specific duty to secure the policy that would cost Noveletsky the least, to go to the ropes with MetLife's underwriters to try to secure Noveletsky a more favorable insurance rating, or to shop around for different policies on Noveletsky's behalf. Temkin's fiduciary duties required her to look out for Rosenthal. It is undisputed that Noveletsky had already selected the MetLife Policy when Temkin was tapped to serve as the ILIT's trustee and that Temkin was appointed trustee for the sole purpose of purchasing the selected policy. In Temkin's role as a fiduciary acting on *Rosenthal*'s behalf, she had no duty to rock the boat or question Noveletsky's selection.

To the extent Harriman's expert opinion suggests Temkin was obligated to do more, it does not fit the facts relevant to Count II, and it is therefore inadmissible under Federal Rule of Evidence 702. First, the entire portion of Harriman's report

concerning the selection process Temkin should have engaged in lumps Temkin and Silverman together. Harriman Report 6-8. This does not accord with the fact that Temkin specifically disclosed that she lacked the expertise to choose the right policy and referred Noveletsky to Silverman before she became the ILIT's trustee.

Second, the entire thrust of Harriman's report is that Temkin failed to meet *Noveletsky*'s needs. Harriman chastises Temkin for not "[e]ngaging *Hollie* in a life insurance design discussion," for not "provid[ing] the client (Hollie Noveletsky) with a range of options," for not sufficiently hewing to "Hollie's stated wishes," and for not properly considering Noveletsky's income tax and estate tax liability. Harriman Report 6-7 (emphasis added). Because the opinion adopts Noveletsky's point of view, rather than the ILIT's, it does not assist the trier of fact in answering the questions Count II poses.

Finally, Harriman's opinion does not flow rationally from his methodology. *See* Fed. R. Evid. 702(c). Though Harriman opines that Temkin and Silverman should have performed a "needs analysis" before recommending an insurance policy, he admits that he never performed a "needs analysis" before reaching his own conclusions. Def. Temkin's Mot. to Exclude Harriman & Gurley's Testimony 10 (ECF No. 180); Oct. 23, 2012 Dep. of Philip Harriman 22 (85:20-22), 41 (162:4-16); 48 (192:5-8) (ECF No. 181-10). An expert cannot rationally opine, out of one side of his mouth, that it is impossible to determine which type of insurance is suitable without performing a needs analysis, and then, out of the other side, that he has nevertheless done so.

Even if the Court determined Temkin was required to re-evaluate the selection of the MetLife Policy, the record is bereft of any evidence from which a fact finder could conclude, without speculation, that the MetLife Policy was an inappropriate selection from the point of view of the ILIT in 2001, when the selection was made. To establish that Temkin made the *wrong* choice, the Plaintiffs must establish that there was a *better* choice.[20] The parties all described the MetLife Policy as the Cadillac of policies. Although from Noveletsky's perspective a Chevy may have sufficed, Temkin, in her role as trustee, was required to look out for Rosenthal alone. The fact that a Cadillac policy was chosen did not harm the ILIT or Rosenthal. The record cannot support a finding that Temkin breached any fiduciary duties in the selection and purchase of the MetLife Policy.

### ii.    Damages

A monetary award in a breach of trust case must be supported by at least some evidence of one of the following: (1) that relief is "required to restore the values of the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered"; or (2) that the trustee reaped some "benefit . . . personally as a result of the breach." Restatement (Third) of Trusts § 100 (2003); *Estate of Wilde*, 708 A.2d at 275-76. Rosenthal and Heaney are entitled to elect a remedy, but they must show enough evidence to allow a reasonable

---

[20]    The Plaintiffs' Statement of Material Facts identifies a number of other insurance policies that were available in 2001, *see* PSMF ¶ 25-35, 223, but only in very broad strokes. They provide the Court almost no information about these policies' terms, and they give the Court no meaningful way in which to compare the policies to the MetLife Policy. The Court discusses the inadequacy of the record with respect to the Manulife Policy in greater detail below.

factfinder to conclude, without speculation, that the ILIT is in a worse position than it would have been had Temkin not purchased the MetLife Policy or that there was profit to Temkin that can be disgorged.

As an initial matter, if the Plaintiffs had been able to establish that the purchase of the MetLife Policy constituted a breach of Temkin's fiduciary duty to exercise prudence, the fact that she received a $40,000 commission on the sale could have supported a disgorgement of profits award.

However, the Plaintiffs would not be able to establish pecuniary harm to the ILIT. The Plaintiffs rely on Duval's damages models.[21] They argue that both the "Actual Premiums + Lost Opportunity" estimate ($269,785) and the "Excess Premiums 2 + Lost Opportunity" estimate ($441,306) could support a monetary damages award based on harm suffered by the ILIT. But there are irredeemable relevancy, fit, and methodology problems with both of these models under *Daubert*.

The Actual Damages + Lost Opportunity estimate relies on an assumption that Noveletsky would have continued giving the ILIT $66,750 per year even if Temkin had not purchased life insurance. This assumption is unsupported. The only reason Noveletsky established the ILIT was to hold a life insurance policy.[22]

---

[21] To the extent the Plaintiffs also rely on Gurley's opinions, those opinions self-evidently fail the "fit" prong of the *Daubert* test, because they concern Noveletsky's tax liability. The ILIT requires no relief for tax expenses incurred by Noveletsky, an entirely distinct legal person.

[22] The Actual Damages + Lost Opportunity model also fails to account for the value to the ILIT of owning $5 million of coverage on Noveletsky's life between 2001 and 2012.

The Excess Premiums 2 + Lost Opportunity model suffers from a similar problem. Duval's theory relies on an assumption that, if Temkin had purchased the Manulife Policy, which had premiums of only $32,505, Noveletsky still would have funded the ILIT at $66,750 a year and allowed the trustee to invest the difference. But there is no evidence in the record to support that assumption. Instead, the only supportable scenario is that Noveletsky would have taken a smaller bonus from Rose Steel and paid only $32,505 into the ILIT each year. To the extent the selection of the MetLife Policy instead of the Manulife Policy caused the ILIT to pay an extra $34,245 in premiums each year, it also caused Noveletsky to take a larger bonus from Rose Steel and give the ILIT more money in the first place. Duval's model only makes sense as a measure of harm suffered by the *ILIT* if the Court conflates the ILIT's legal identity with Rose Steel and Noveletsky. Noveletsky does not get to reap the benefits of separate legal entities (limited corporate liability and trust tax advantages) when it suits her and then disregard them as legal fictions when they stand in her way.

The Excess Premiums 2 + Lost Opportunity model has additional problems. This model relies entirely on Harriman's opinion regarding an alternate Manulife Policy that Noveletsky could have selected instead of the MetLife Policy. But Harriman's underlying opinion is flawed for two reasons. First, Harriman's opinion regarding the price of the Manulife Policy depends on an assumption that Noveletsky would have qualified for a "preferred" rating under Manulife's underwriting standards, but Harriman testified that he never reviewed those standards and does not know what Noveletsky's rating would have been. PSMF ¶ 223; Harriman Report

at 11; Oct. 23, 2012 Dep. of Philip Harriman 66 (264:3-7), 67 (265:21-23, 266:8-22).

His opinion therefore lacks sufficient facts or data. *See* Fed. R. Evid. 702(b).

Second, neither Harriman's report nor the Plaintiffs' Statement of Material Facts include or even cite to a detailed description of the Manulife Policy's terms. *See* PSMF ¶ 223; Harriman Report 11. The Court therefore has no evidence before it regarding a number of factors necessary to determine the liability the ILIT would have faced if it still held the Manulife Policy, including: (1) whether the Manulife Policy would have produced dividends that might be used to offset future premium payments;[23] (2) how much the ILIT could have expected to pay for the Manulife Policy during the course of Noveltsky's life based on the prevailing financial forecasts and actuarial estimates; and (3) whether the Manulife Policy's death benefit was guaranteed or would lapse if Noveletsky reached 100 years of age. The Court is asked to assess Harriman's broad opinion about the Manulife Policy in a vacuum.

Duval does nothing to correct the deficits in Harriman's opinion. By failing to assign a present value to future expenses the ILIT would have incurred, Duval's Excess Premiums 2 + Lost Opportunity model presents an overly simplified, backward-looking view of the case. The missing information is critical to assess whether the ILIT was worse off with what it actually got—a fully paid-up Genworth Policy—than what it would have had if it had purchased the Manulife Policy. Because the opinions on which Rosenthal and Heaney rely to establish that the ILIT suffered

---

[23]   As far as the ILIT is concerned, a self-funding policy would have been very valuable. Once the policy became self-funding, the ILIT would no longer have been dependent on any outside source of funding.

harm are inadmissible under Federal Rule of Evidence 702, the record does not support a compensatory theory of damages.[24]

### c. Count III: Imprudent Administration of the ILIT

In Count III, Rosenthal and Heaney allege that Temkin breached her fiduciary duty of prudence to the ILIT by failing to monitor the performance of the MetLife Policy and adjust course once it became clear that it was not generating dividends at the anticipated rate. Temkin moves for summary judgment on Count III on two main grounds: (1) § 4(B) of the Trust Instrument excuses her from liability; and (2) there is no admissible evidence to support a monetary award.

### i. Section 4(B) of the Trust Instrument

Section 4(B) of the Trust Instrument provides, in relevant part, that

> during the time in which the assets of the trust estate consist solely of principal cash, if any, and insurance policies, the Trustee shall not be required to diversify investments nor make any investment recommendations.

Trust Instrument 7.

Because the ILIT's only assets during Temkin's trusteeship were the cash Temkin received from Noveletsky and the MetLife Policy, this provision was in full force at all times relevant to this suit. Accordingly, on its face, Section 4(B) liberated

---

[24] There is evidence in the record that the ILIT could have purchased the Manulife Policy at an annual premium rate of approximately $43,000 even if Noveletsky had not been able to secure a "preferred rating," Oct. 23, 2012 Dep. of Philip E. Harriman 66 (262:10-263:16), 67 (266:8-267:9) (ECF No. 181-10). There is also evidence in the record that the ILIT could have purchased a number of other life insurance policies in 2001 that had lower annual premiums than the MetLife Policy. SSMF ¶ 8; PSMF ¶¶ 25-35; ECF No. 192-5. The Plaintiffs chose not to include or cite to detailed descriptions of any of these policies' terms in their statements of material fact or develop damages models based on them. The Court is not obligated to sift through the record to determine if Rosenthal and Heaney could have established a pecuniary loss. *See* D. Me. Local R. 56(f); *Sánchez-Figueroa*, 527 F.3d at 213-14.

Temkin from any duty to seek out new investments for the ILIT or make any investment recommendations to Rosenthal during her entire tenure as trustee. It allowed her to dispatch her duty of prudence to the ILIT by maintaining the status quo level of insurance coverage.

Rosenthal and Heaney's claim in Count III alleges that Temkin impermissibly failed to monitor the performance of the MetLife Policy. But as an *insurance policy*, the MetLife Policy remained indisputably robust. The Plaintiffs do not contest that from the moment Temkin purchased the MetLife Policy on the ILIT's behalf until she resigned as the ILIT's trustee, the policy provided the $5 million of life insurance for which it was purchased. It was only as an *investment* that the MetLife Policy sputtered. Because Temkin had no duty to diversify the ILIT's investment portfolio or make any investment recommendations, her failure to monitor the ILIT in this regard cannot support a claim for breach of trust.

## ii.    Damages

Because Rosenthal and Heaney seek only monetary relief under Count III, they must support their claim with evidence that would allow a fact finder to conclude, without speculation, that the ILIT is in a worse financial position than it would have been had the ILIT been administered prudently or that Temkin benefitted personally from her imprudence, and there are therefore profits available to disgorge. They cannot do so. Accordingly, even if Rosenthal and Heaney had been able to prove a breach of trust under Count III, Temkin would still be entitled to summary judgment on the issue of monetary relief.

To demonstrate financial harm to the ILIT, Rosenthal and Heaney rely on the testimony of Harriman, Gurley, and Duval. Those opinions are inadmissible to show harm under Count III for the same reasons they were inadmissible to show harm under Count II, but also for additional reasons. First, the opinions provide no basis for the Court to discern what position the ILIT would be in if Temkin had abandoned the MetLife Policy when it started to underperform as an investment. They do not identify a moment in time that Temkin should have made a change. They do not consider what the cost of a replacement policy would have been or what the MetLife Policy's cash value was at that particular moment in time. The Plaintiffs' experts provide no answer to the damages question at the heart of this claim. *See* Fed. R. Evid. 702(a).

Nor could the evidence in the summary judgment record support a disgorgement of profits award under Count III. As opposed to Count II, Count III concerns Temkin's conduct *after* she and Silverman sold the MetLife Policy to the ILIT and received a commission on the sale. But is undisputed that neither MetLife nor the ILIT provided Temkin any compensation for her work as the ILIT's trustee. Even if Rosenthal and Heaney had been able to establish that Temkin administered the trust imprudently, they would not be able to show any benefit inured to Temkin as a result.

### d. Count IV: Failure to Provide Reports and to Keep Rosenthal Reasonably Informed About Trust Administration

In Count IV, Rosenthal and Heaney seek to hold Temkin liable for failing to provide Rosenthal with annual accountings of the ILIT. Rosenthal, Heaney, and Temkin all move for summary judgment.[25]

The Court pauses to review briefly the law applicable to this Count. Under the common law, trustees have a duty to keep beneficiaries reasonably informed about "significant developments concerning the trust and its administration, particularly material information needed . . . for the protection of their interests," and a duty to adhere to the terms of the trust. Restatement (Third) of Trusts §§ 76, 82 (2003); *Estate of Whitlock*, 615 A.2d at 1178. Under the Maine Probate Code, which applied to the ILIT from its inception through June 30, 2005, a trustee must "keep the beneficiaries of the trust reasonably informed of the trust and its administration." 18-A M.R.S.A. § 7-302(e) (2001); *see also* 18-B. M.R.S. § 1104(1). Under the Maine Uniform Trust Code, which applied to the ILIT beginning on July 1, 2005, and remains in effect, a trustee must "keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests." 18-B M.R.S. § 813. Finally, § 12(A) of the Trust Instrument provides that "[t]he Trustee shall render accounts of the administration of the trust annually." Trust Instrument 13.

At a minimum, Section 12(A) of the Trust Instrument unambiguously requires the ILIT's trustee to render annual accounts. Additionally, Temkin may have had a

---

[25] The Plaintiffs also argue that Temkin should be held liable under Count IV for her failure to disclose her commission. The Court's analysis of the issue in Count I, where the Court rejected the Plaintiffs' claim, is equally applicable here.

duty under Maine common law and statutory law to bring it to Rosenthal's attention that the MetLife Policy was paying lower dividends than expected. However, the Court lacks sufficient information to grant summary judgment to either party on the issue of whether Temkin failed to meet these obligations. For instance, the parties' statements of material facts do not indicate with any precision what information was in the Crummey letters, and the parties' briefing provides little clarity on whether Temkin could dispatch her reporting duties by providing statements to Noveletsky, the beneficiary's mother, once Rosenthal was no longer a minor.

However, Temkin also asserts Rosenthal and Heaney failed to generate a triable issue as to whether the ILIT is entitled to damages. To meet their burden of production, Rosenthal and Heaney must identify evidence that would allow a fact finder to conclude, without speculation, either: (1) that the ILIT is in a worse financial position than it would have been had Temkin not failed to report this information; or (2) that Temkin's failure to report caused her to receive a profit. For the same reasons discussed as to Counts II and III, there is no admissible evidence in the record to support a finding that the ILIT suffered financial harm. For the same reason discussed as to Count III, there is no evidence that Temkin profited in any way by failing to render annual accounts. Temkin is therefore entitled to summary judgment on Count IV.

### B.     Counts V & VIII: The Tort Claims Against Temkin

#### 1.     Count V: Negligence

Rosenthal and Heaney assert a negligence claim against Temkin on the basis that she held herself out as capable of procuring a policy consistent with Noveletsky's

goals but that she failed to take reasonable care in her advice to Noveletsky. As the Plaintiffs conceded at oral argument, whatever duties Temkin had in this regard arose out of her fiduciary relation to the ILIT, not a more general tort duty of reasonable care. This count is thus subsumed within the Plaintiffs' fiduciary claims in Counts I through IV and is dismissed as a separate cause of action.

### 2. Count VIII: Misrepresentation

The Plaintiffs concede that Temkin made no affirmative misrepresentations concerning the MetLife Policy. Instead, their misrepresentation claim against her hinges on the premise that Temkin's role as the ILIT's trustee created affirmative duties to disclose her commission and details about the MetLife Policy's terms and performance. At oral argument, the Plaintiffs conceded that any duty to disclose would have arisen through Temkin's position as trustee, and thus Count VIII was subsumed by the breach of trust counts. As the discussion of Counts I and IV demonstrates, Temkin had no duty to disclose her commission. As the discussion of Counts II and III shows, there is no admissible evidence in the record that the ILIT or its beneficiary suffered any pecuniary loss from buying or holding onto the MetLife Policy, a necessary element of a claim of either intentional or negligent misrepresentation. Temkin is therefore entitled to summary judgment on Count VIII.

### C. Count VII: The Unfair Trade Practices Act Claim Against Temkin

The Maine Unfair Trade Practices Act (the "**UTPA**") provides a private right of action for any "person who purchases or leases goods, services or property . . . for personal, family or household purposes and thereby suffers any loss of money or property . . . as a result of the use or employment by another person of" an unfair

trade practice. 5 M.R.S. §§ 207, 213. "[T]o recover damages for a violation of the UTPA," a plaintiff "must show a loss of money or property that results from the violation." *William Mushero, Inc. v. Hull*, 667 A.2d 853, 855 (Me. 1995).

At this late stage of the suit, it remains unclear what exactly the Plaintiffs believe Temkin did that constituted an unfair trade practice. However, the only purchase of goods, services, or property suggested by the record is the ILIT's purchase of the MetLife Policy in 2001. As discussed above, there is no admissible evidence in the record to support a finding that the ILIT suffered any loss as a result of buying the MetLife Policy. Temkin is therefore entitled to summary judgment as to Count VII.

## II.    Claim Against Alan Silverman

The only surviving claim against Silverman is Noveletsky's allegation in Count VIII that Silverman is liable for misrepresentation for affirmative statements he made about how long it would take for the MetLife Policy to become fully self-funding. *Noveletsky,* 2013 WL 2945058, at *10. The Amended Complaint does not distinguish between the tort of fraudulent misrepresentation [26] and the tort of negligent misrepresentation.[27] Noveletsky appears to assert both.

---

[26]    A defendant is liable for fraudulent misrepresentation if he

(1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or refrain from acting in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage.

*Letellier v. Small*, 400 A.2d 371, 376 (Me. 1979).

[27]    The Law Court describes the tort of negligent misrepresentation as follows:

The Defendants now move for summary judgment on the basis that Noveletsky cannot identify admissible record evidence to support a finding that she suffered damages or is otherwise entitled to relief. Noveletsky responds that she is entitled to either compensatory damages or rescission and puts forth multiple theories of how a fact finder could determine she is entitled to an award. First, relying on Duval's expert opinions, Noveletsky claims she should recover either: (1) the full amount of the premiums she paid plus lost opportunity costs; or (2) the excess premiums she paid over those she would have paid for the Manulife Policy plus lost opportunity costs. Second, relying on Gurley's expert opinions, Noveletsky also claims that she is entitled to recover for adverse tax consequences she suffered because she relied on Silverman's alleged misrepresentations.

With respect to rescission, the Plaintiffs point to a line of Maine cases that provide that a person who is "induced by false representations to take out a policy of insurance . . . can avoid it, and recover the premiums paid upon it." *Mailhoit v. Metro. Life Ins. Co.,* 32 A. 989, 992 (Me. 1895); *Estate v. Whitlock*, 615 A.2d at 1176. The problem for Noveletsky is that these cases assume a pre-existing contract between the plaintiff and the defendant. Because Noveletsky did not enter into a contract with Silverman or MetLife, rescission is not available to her. The only thing Noveletsky

---

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990) (quoting Restatement (Second) of Torts § 552(1) (1977)).

could conceivably rescind would be her gifts to the ILIT, but she has not sued the ILIT.

A misrepresentation plaintiff seeking a remedy *other than* rescission must show that that he actually suffered a pecuniary loss and that "his damages were the proximate result of his reliance upon the alleged misrepresentations . . . ." *Horner v. Flynn*, 334 A.2d 194, 204 (Me. 1975); *see also Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me. 1987); Restatement (Second) of Torts §§ 548A, 549 (1977). In a fraudulent misrepresentation case, the measure of damages is the benefit of the bargain the plaintiff had expected. *Wildes v. Pens Unlimited Co.*, 389 A.2d 837, 841 (Me. 1978); *see also Wright v. Roach*, 57 Me. 600, 601 (1870) (correct measure of damages the difference between the value of a farm as represented and its actual value as conveyed, not the difference between the actual value of the farm and the price paid for it). In a negligent misrepresentation case, damages are limited to the plaintiff's out-of-pocket losses. *See Chapman*, 569 A.2d at 830; Restatement (Second) of Torts § 552C(2) (1977); Jack H. Simmons, Donald N. Zillman & David D. Gregory, *Maine Tort Law* § 11.04 (2004 ed.).

Accepting Noveletsky's view of the facts, the benefit of the bargain she *thought* she was getting was an insurance policy with a $5 million death benefit that would be fully paid up, under the worst-case scenario, after she paid out twelve premiums, or $801,000 in total. The problem for Noveletsky is that she prevailed on the ILIT's trustee to cash in the policy after she had paid only approximately $600,000 to the ILIT. The ILIT used the MetLife Policy's surrender value to buy a fully paid up policy, so Noveletsky never suffered an actual benefit-of-the-bargain loss.

Nor do the Plaintiffs' expert opinions demonstrate actual pecuniary loss under a more standard tort damages analysis, whether limited to out-of-pocket expenses or measured more expansively. Duval's Actual Premiums + Lost Opportunity model serves as a fair estimate of how much money Noveletsky would have now if she had foregone life insurance altogether. But this model does not fit the facts the Plaintiffs developed. Noveletsky's claim relies on a single alleged affirmative misrepresentation—Silverman's statement that if Noveletsky bought the MetLife Policy, she "would only have to pay for 10, maybe 12 years max and the policy would pay for itself out of its dividends." PSMF ¶ 69. Noveletsky would be entitled to damages calculated according to the Actual Premiums + Lost Opportunity model only if she could show that her reliance on *this statement*—not Silverman's failure to give free estate planning advice—factually and legally caused her to secure life insurance for Rosenthal. But Noveletsky was already seeking life insurance when she met Silverman. Silverman's alleged statement about one feature of the MetLife Policy might have caused Noveletsky to buy that policy as opposed to another, but a fact finder could not reasonably conclude it was the reason she arranged for the ILIT to buy a life insurance policy at all.

Duval's Excess Premium 2 + Lost Opportunity model is a better fit, as it provides a fair estimate of how much extra money Noveletsky would have had in 2012 if the ILIT had bought the Manulife Policy instead of the MetLife Policy. But, as already discussed above, this model ignores what the ILIT would have paid into the future for the Manulife Policy. It therefore fails to answer the bottom line question of whether Noveletsky suffered any actual pecuniary loss at all.

Finally, Gurley's opinions on income tax losses and estate tax liability are all either irrelevant or based on the same flawed assumptions as Duval's two models. Gurley's opinions regarding the tax consequences of failing to employ a split-dollar arrangement—Opinions 3(A) and 3(B)—no longer fit the facts of the case. There is no plausible argument that Silverman's alleged misrepresentation about how long it would take the MetLife Policy to become self-funding is related to Noveletsky's failure to take advantage of an unrelated accounting device. The rest of Gurley's opinions rely on the same flawed assumptions discussed above with respect to Duval's damages models. Opinions 1(A) and 2(B) assume, without support, that Noveletsky would have foregone life insurance altogether if not for Silverman's alleged misrepresentations. Opinions 1(B) and 2(D) both fail to account for how much tax liability Noveletsky would have incurred going forward from 2012 if the Manulife Policy had been purchased and assume, without support, that she could have qualified for a "premium" rating under Manulife's underwriting standards.

For the above reasons, the record cannot support a finding that Noveletsky suffered any pecuniary loss as a proximate cause of Silverman's alleged representation about how long it would take the MetLife Policy to become self-funding. Silverman is therefore entitled to summary judgment on Count VIII.[28]

---

[28]     Because of the Court's disposition on the issue of damages, it does not reach the Defendants' arguments that the statute of limitations bars relief or that Noveletsky failed to generate a triable issue as to whether she *justifiably* relied on Silverman's representations. *See* Def. MetLife's Mot. for Summ. J. 26-27.

### III.    Claims Against MetLife

Under Counts I through V, Rosenthal and Heaney seek to hold MetLife vicariously liable for alleged breaches of fiduciary duty and the duty of care committed by Temkin and Silverman. Under Count VIII, the Plaintiffs seek to hold MetLife vicariously liable for the tort of misrepresentation. With respect to all of these counts, the Court's decision to grant summary judgment on the underlying claims requires the Court to grant summary judgment to MetLife, too. *See* Simmons, Zillman & Gregory, *supra*, § 16.02 n.1.

Rosenthal and Heaney also bring two claims against MetLife directly. Under Count VI, they seek to hold MetLife liable for the tort of negligent supervision, a type of negligence recognized by the Law Court in *Fortin v. Roman Catholic Bishop of Portland*, 871 A.2d 1208 (Me. 2005). To succeed, they must establish, among other things, that there was a special relationship between MetLife and the ILIT or Rosenthal, its beneficiary, which entitled the ILIT/Rosenthal to "a right to protection" by MetLife. *Dragomir v. Spring Harbor Hosp.*, 970 A.2d 310, 315 (Me. 2009); *Parker v. Harriman*, 516 A.2d 549, 550 (Me. 1986).

Traditionally, a right to protection from negligent supervision only arose in relationships between:

> (1) common carriers and their passengers; (2) innkeepers and their guests; (3) possessors of land and members of the public who are their invitees; and (4) those who are required by law to take physical custody of another or who voluntarily do so, "such as to deprive the other of his normal opportunities for protection."

*Dragomir*, 970 A.2d at 315-16 (quoting Restatement (Second) of Torts § 314A (1965)).

It is self-evident that none of those categories apply here.

However, the Law Court recognizes a fifth category of special relationship giving rise to a right to protection: fiduciary relationships "in which there exists a 'great disparity of position and influence between the parties.' " *Dragomir*, 970 A.2d at 316. Accordingly, the Law Court has allowed negligent supervision claims to go forward based on the relationship between a hospital and a psychiatric patient who claimed a hospital social worker entered into a sexual relationship with him, *id.*, and the relationship between a Roman Catholic Diocese and an altar boy who claimed a priest sexually abused him. *Fortin*, 871 A.2d at 1233.

The relationship between MetLife and the ILIT and Rosenthal, its beneficiary, is vastly different from the relationships at issue in *Dragomir* and *Fortin*. In her attempt to generate a triable issue that her relationship with MetLife is nonetheless captured by those holdings, Noveletsky points only to 24-A M.R.S. § 1445(1), a penal statute enforced by Maine's Superintendent of Insurance which requires insurers to provide "adequate training" and "supervision" for sales agents. Pls.' Opp'n to MetLife's Mot. for Summ. J. 4 (ECF No. 188). Noveletsky's citation is a puzzling non-sequitur. The statute she identifies does not create a fiduciary relationship between MetLife and Noveletsky, much less establish that there was a great disparity of position and influence between them. Because Noveletsky has not identified evidence in the record showing a genuine issue of material fact that a special relationship existed, MetLife is entitled to summary judgment on Count VI.

Finally, under Count VII, Rosenthal seeks to hold MetLife directly liable for violating Maine's UTPA. As discussed in the analysis of Rosenthal and Heaney's UTPA claim against Temkin, there is no admissible evidence to support a finding

that the ILIT suffered any loss as a result of buying the MetLife Policy from MetLife. Count VII fails as to MetLife, too.

## CONCLUSION

For the reasons stated above, Silverman's, Temkin's, and MetLife's motions for summary judgment are **GRANTED,** and the Plaintiffs' cross-motion for partial summary judgment is **DENIED**. The Defendants' *Daubert* motions are **GRANTED IN PART**. The remainder of the objections raised in the Defendants' *Daubert* motions and all the objections raised in the Plaintiffs' *Daubert* motion are **DENIED AS MOOT**.


**SO ORDERED**.


/s/ Nancy Torresen
United States District Judge


Dated this 24th day of September, 2014.